■ SUSAN LANGFORD, Appellant, v ROMAN CATHOLIC DIOCESE OF BROOKLYN et al., Defendants, and NICHOLAS SIVILLO, Respondent. [705 NYS2d 661] —In an action, *inter alia*, to recover damages for negligence and breach of fiduciary duty, the plaintiff, Susan Langford, appeals from an order of the Supreme Court, Kings County (Kramer, J.), dated June 23, 1998, which granted the motion of the defendant Nicholas Sivillo for summary judgment dismissing the complaint insofar as asserted against him, and purportedly granted her motion to vacate an order of the same court, dated January 9, 1998, granting the motion of the remaining defendants for summary judgment dismissing the complaint upon her default in opposing the motion and granted the motion for summary judgment on the merits.

Ordered that the appeal from so much of the order as purportedly granted the plaintiff's motion to vacate the order dated January 9, 1998, and thereupon granted the motion of the defendants, other than Nicholas Sivillo, for summary judgment on the merits, is dismissed as the plaintiff's motion remains pending and undecided (*see, Katz v Katz,* 68 AD2d 536); and it is further,

Ordered that the order is affirmed; and it is further,

Ordered that the respondent is awarded one bill of costs payable by the appellant.

The complaint asserted causes of action alleging, *inter alia*, negligence, breach of fiduciary duty, negligent and intentional infliction of emotional distress, and battery, allegedly arising from a sexual relationship the plaintiff had with the defendant

Monsignor Nicholas Sivillo. The relationship between Sivillo and the plaintiff commenced in 1989 when, after being diagnosed with multiple sclerosis, the plaintiff "looked to God for direction". When the plaintiff's condition went into remission, the plaintiff believed it was due to Sivillo's prayers. While the relationship between Sivillo and the plaintiff initially involved spiritual counseling, it later evolved to include a sexual component. In 1992, the plaintiff began seeing a therapist and eventually she determined that Sivillo had manipulated and used her. According to the plaintiff's pleadings, each time Sivillo physically touched her, it was intentional, offensive, and unwelcome, but she acquiesced because she did not want to lose her spiritual link and her "best friend".

The cause of action alleging that Sivillo negligently handled the counseling relationship in fact stated a claim for malpractice (*see, Scott v Uljanov,* 74 NY2d 673; *Gross v Kurk,* 224 AD2d 582). As such, it was properly dismissed because any attempt to define the duty of care owed by a member of the clergy to a parishioner fosters excessive entanglement with religion (*see, Joshua S. v Casey,* 206 AD2d 839; *Schmidt v Bishop,* 779 F Supp 321).

Further, the gravamen of the cause of action labeled as one to recover damages for breach of fiduciary duty, was clearly that Sivillo was guilty of clergy malpractice (*see, Schmidt v Bishop, supra*). The plaintiff, under the care of a psychiatrist because of suicidal thoughts, sought religious and spiritual counseling from Sivillo and any breach of Sivillo's fiduciary duties can only be construed as clergy malpractice, since it would clearly require a determination concerning Sivillo's duties as a member of the clergy offering religious counseling to the plaintiff. Further, while the dissent urges recognition of a cause of action to recover damages for breach of fiduciary duty, as the trial court stated, this would require the courts to "venture into forbidden ecclesiastical terrain". The same is true for the plaintiff's cause of action to recover damages for negligent infliction of emotional distress and therefore, that cause of action was also properly dismissed.

Finally, the cause of action allegedly based on breach of fiduciary duty, as well as the remaining causes of action alleging intentional torts, were untimely, as the one-year Statute of Limitations had run before this action was commenced. Regardless of how they were pleaded, these causes of action sought to recover damages for the unwelcome, intentional sexual conduct by Sivillo and were thus governed by a one-year Statute of Limitations (*see, Tserotas v Greek Orthodox Archdio-*

*cese,* 251 AD2d 323; *Sharon B. v Reverend S.,* 244 AD2d 878; *Jones v Trane,* 153 Misc 2d 822). Inasmuch as Sivillo interposed an affirmative defense which alleged that the causes of action for intentional or willful acts, including, but not limited to those labeled as such by the plaintiff, were untimely, the Statute of Limitations defense was not waived.

The plaintiff's claims concerning her motion to vacate the order dated January 9, 1998, which granted a motion by the remaining defendants for summary judgment upon her default in opposing the motion, are not properly before this Court as the order appealed from did not decide that motion (*see, Katz v Katz,* 68 AD2d 536, *supra*). Santucci, J. P., Sullivan and Florio, JJ., concur.

S. Miller, J., concurs in part and dissents in part and votes to modify the order appealed from by deleting the provision thereof granting that branch of the motion of the defendant Nicholas Sivillo which was to dismiss the plaintiff's cause of action to recover damages for breach of fiduciary duty and substituting therefor a provision denying that branch of the motion and reinstating that cause of action with the following memorandum: I cannot concur in so much of the Majority's decision as holds that the plaintiff may not recover damages under a theory of breach of fiduciary duty. In my opinion, the plaintiff's allegations and the evidence in the record fully support such a theory—one that is gaining recognition throughout the country as a result of the disturbingly frequent incidence of sexual predation by clergymen against vulnerable members of their flocks.

I disagree with the Majority's conclusion that the plaintiff's cause of action to recover damages for breach of fiduciary duty is equivalent to a cause of action for clergy malpractice. These two causes of action are markedly distinct, as will be demonstrated below.

I disagree most significantly with the Majority's holding that any attempt to define the duty of care owed by a member of the clergy to a parishioner fosters "excessive entanglement with religion". That holding will establish appellate precedent shielding from civil judicial examination even the most flagrant clerical misconduct perpetrated upon vulnerable parishioners, children as well as adults. The injured will be deprived of any recourse short of criminal prosecution. The miscreant clergy, unsanctioned, will remain free to continue undeterred. Such a holding flies in the face of precedent firmly established in this State (*see, First Presbyt. Church v United Presbyt. Church,* 62 NY2d 110, 119-121, *cert denied* 469 US 1037; *Avitzur v Avit-*

*zur,* 58 NY2d 108, *cert denied* 464 US 817). Moreover, the First Amendment to the United States Constitution was not intended to protect the misconduct of clergy where examination of their conduct does not require any inquiry into church doctrine *(see, Wisconsin v Yoder,* 406 US 205, 215; *Employment Div., Dept. of Human Resources v Smith,* 494 US 872, 879-890; *First Presbyt. Church v United Presbyt. Church, supra; Avitzur v Avitzur, supra; Moses v Diocese of Colorado,* 863 P2d 310, 319-321 [Colo], *cert denied* 511 US 1137). Clearly no examination of church doctrine is required in order for the plaintiff's claims against her priest to be heard.

## FACTS

For purposes of this appeal, the following facts have been alleged and not expressly controverted. In February 1988, the plaintiff, Susan Langford, began suffering from vision problems that were diagnosed as symptoms of optic neuritis and she was told that this condition was a common precursor to multiple sclerosis. In January 1989, Langford was diagnosed as suffering from multiple sclerosis. Feeling fearful, hopeless, and suicidal, Langford turned to her parish church, the defendant Our Lady of Hope, for direction and counseling regarding the effects of her disease. In February 1989 she first spoke with the defendant, Monsignor Nicholas Sivillo.

Sivillo visited Langford's home where she confided in him her fears, anxieties, and sense of hopelessness. He consoled her with assurances that he would beseech the Lord to fill her with peace. Shortly thereafter, Langford saw a psychiatrist who recommended that Langford not be left alone because of her suicidal tendencies. Sivillo visited Langford's home three to four times per week and counseled Langford regarding her life, her personal problems, her depression, her marriage, and her future, while also continuing to assure her that God would not forsake her and that he (Sivillo) was her "lifeline". Several months later, the multiple sclerosis went into remission and Sivillo told Langford that it was his prayers that "made her better". He continued to counsel her regularly.

One day in May 1990 Sivillo visited Langford and told her that he loved her. At this juncture he transformed their relationship from priest/counsellor and parishioner to sexual predator and victim. Although he acknowledged that he had taken a vow of celibacy, he told Langford that celibacy prevented only sexual intercourse, and that any relations besides intercourse were condoned by the church as part of the "human condition". Langford began to cry and declared that their relationship

must end because of his advances, after which Sivillo grabbed and hugged Langford, telling her that only his prayers were keeping her well and preventing her illness from recurring. On the following day Sivillo explained that Langford needed him to continue her recovery. Convinced that Sivillo was indeed her "lifeline" without whose counseling her physical condition would certainly regress, Langford succumbed to his advances and began to have sexual intercourse with him. The sexual relationship continued from 1990 through 1993, during which time Sivillo even met with Langford's husband and advised him "to move on with his life" because their marriage was not salvageable. When Langford and Sivillo met, he supplied tranquilizers to calm Langford's anxiety.

Despite pressures exerted by Sivillo to induce Langford to keep their relationship a secret, in 1992 Langford began seeing a secular therapist to help her resolve her anxiety and inner conflicts. With the aid of her therapist, Langford slowly realized that Sivillo had manipulated her, and she began seeing him less frequently. She saw Sivillo only four times in 1994, but he continued to remind her of the agony she would face, alone, as a cripple, and that he was her only hope of avoiding a wretched future. In November of 1994, Langford was finally capable of severing all ties with Sivillo.

## PROCEEDINGS

Langford commenced the instant action in June 1995 against the Roman Catholic Diocese of Brooklyn, Our Lady of Hope, three other clergymen (collectively referred to herein as the Diocese), and Sivillo. Asserting claims, among others, of negligence, breach of fiduciary duty, infliction of emotional distress, and battery, Langford claimed that the defendants' conduct forced her to incur expenses for medicine and medical care, and to experience severe stress, anxiety, guilt, fear, humiliation, and shame, and that her faith was shattered.

The Diocese was awarded summary judgment dismissing the complaint upon Langford's default in opposing the motion. Langford moved to vacate her default, and Sivillo moved for summary judgment dismissing the complaint insofar as asserted against him. The court granted Sivillo's motion, although its order did not address Langford's motion to vacate her default.

On this appeal by Langford, the Majority has affirmed the dismissal of the complaint as against Sivillo. I agree that Langford's motion to vacate her default in opposing the motion of the Diocese was not decided in the order on appeal and thus

the issues she raises regarding that motion are not before us (*see, Katz v Katz,* 68 AD2d 536). I further agree that the Supreme Court correctly awarded Sivillo summary judgment dismissing Langford's causes of action, other than the one alleging breach of fiduciary duty, on the ground, among others, of the Statute of Limitations. I do not concur with my colleagues in the Majority, however, insofar as the Court awarded Sivillo summary judgment dismissing Langford's cause of action based on breach of fiduciary duty. I would reinstate that cause of action and to this extent I must dissent.

## STATUTE OF LIMITATIONS

Initially, I am not persuaded by Sivillo's contentions, raised for the first time on appeal, that Langford's breach of fiduciary duty claims are time-barred by the one-year Statute of Limitations applicable to intentional torts (*see,* CPLR 215 [3]). Sivillo did not raise this argument in his motion papers with regard to Langford's cause of action based on breach of fiduciary duty and thus, this defense has been waived (*see,* CPLR 3211[e]). In any event, the Statute of Limitations for a cause of action based on breach of fiduciary duty is either three or six years, depending on the remedy sought (*see, Loengard v Santa Fe Indus.,* 70 NY2d 262; *Yatter v William Morris Agency,* 256 AD2d 260). Here, under either Statute of Limitation, Sivillo has not proven, as a matter of law, that Langford's claims are untimely.

Moreover, I disagree with the Majority's conclusion that the plaintiff's causes of action based on breach of fiduciary duty actually allege intentional torts subject to a one-year Statute of Limitations. The instant case is easily distinguishable from those cases cited by the Majority in support of the assertion that all instances of unwelcome sexual conduct constitute intentional torts subject to a one-year period of limitations.

*Tserotas v Greek Orthodox Archdiocese* (251 AD2d 323) involved a single instance when the defendant priest allegedly physically forced a parishioner into an act of sexual intercourse; in effect, a rape by forcible compulsion. Although this assault occurred in the context of a counseling relationship, the shocking suddenness of this sexual attack is much more reasonably categorized as an intentional sexual assault than was the more subtle, calculated, manipulative conduct alleged of Sivillo. Sivillo did not rape the plaintiff by forcible compulsion. Rather, he took unfair advantage of his claimed status as the savior of the plaintiff's health, and violating the trust he earned thereby, led her into an ostensibly consensual, ongoing relationship. Yes, his reprehensible conduct was intentional, but I do not agree

that the gravamen of the plaintiff's cause of action based on breach of fiduciary duty is based on an intentional sexual assault as in *Tserotas*.

*Sharon B. v Reverend S.* (244 AD2d 878) does not support the Majority's conclusion herein as the published decision and order of the Appellate Division,. Fourth Department, in that case does not recite any salient facts as to the nature of the sexual abuse; how often it occurred and under what circumstances, nor does the decision reveal whether the plaintiff therein even asserted a cause of action based on breach of fiduciary duty. Thus, Sharon B. is inapplicable to the facts of the instant case.

Finally, *Jones v Trane* (153 Misc 2d 822), is also distinguishable on its facts since it involved alleged homosexual abuse of an 11-year-old boy by a priest. It is also noteworthy that the court in *Jones v Trane* declined to dismiss the infant plaintiff's third and fifth causes of action based upon breach of trust, because the court perceived no excessive entanglement with religion since no church doctrine justified the defendant priest's alleged sexual misconduct. Accordingly, not only do I disagree that the plaintiff's cause of action based on breach of fiduciary duty is time-barred, but as I shall demonstrate, *infra*, consideration thereof does not run afoul of the First Amendment.

## FIRST AMENDMENT CLAIMS

The First Amendment states in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof" (US Const 1st Amend). The proper judicial interpretation of the latter clause, "the free exercise clause", has been the subject of much controversy in cases pitting parties' rights to engage in conduct that is sincerely rooted in religious belief against State governments advancing compelling interests that may override any such rights (*see, e.g., Ware v Valley Stream High School Dist.,* 75 NY2d 114, *modg* 150 AD2d 14). But at the outset of any First Amendment analysis, a court must bear in mind that "to have the protection of the Religion Clauses, the claims must be rooted in religious belief" (*Wisconsin v Yoder,* 406 US 205, 215). Finding that the First Amendment has never been applied so as to confer a right to anyone to threaten the public safety, regardless of any religious motivation (*see, Employment Div., Dept. of Human Resources v Smith,* 494 US 872, 879-890, *supra*), the Supreme Court later stated that "[w]e have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct

that the State is free to regulate" (*Employment Div., Dept. of Human Resources v Smith, supra*, at 878-879).

Monsignor Sivillo's robes should not shield him from liability for egregious acts not sanctioned by his church or the secular community. He makes no claim to this Court that his alleged conduct is supported or even tolerated by his parish, by the doctrine of the Catholic or any other church, or by the doctrine of *any* religion at all. Nor does he claim that his alleged conduct was motivated by his personal interpretation of any religion, or that his conduct was rooted in religious belief. Sivillo only invokes the First Amendment for a much more specific purpose, to defend against Langford's claims of clergy malpractice and breach of fiduciary duty.

The First Amendment has never been invoked to shield clerical misconduct from criminal prosecution, nor has it been invoked to shield clerical misconduct from liability for intentional tortious conduct. Langford's allegations of Sivillo's gross betrayal of trust and abuse of power on threats of illness or death are no less alien to the teachings of the church than criminal or intentional tortious conduct.

## CLERGY MALPRACTICE v BREACH OF FIDUCIARY DUTY

While a claim of clergy malpractice may require a court to examine ecclesiastical doctrine, a claim of breach of fiduciary duty raises secular issues, which can be adjudicated using neutral principles of law (*see, First Presbyt. Church v United Presbyt. Church*, 62 NY2d 110, 119, *supra* [explicitly adopting "neutral principles of law" mode of analysis in New York, and finding that disputes involving religious entities can be adjudicated by courts when no inquiry into church doctrine is required]; *see also, Avitzur v Avitzur*, 58 NY2d 108, *supra* [reversing an order dismissing complaint to enforce term of a religious document governing marriage, and holding that when doctrinal issues need not be examined, secular obligations entered into in religious document are enforceable when neutral principles of law can be applied]; *Jones v Trane*, 153 Misc 2d 822, *supra*, at 828-829 [First Amendment did not prevent breach of trust claim against priest who allegedly sexually abused plaintiff, and expressly refusing to dismiss clergy malpractice claim as unconstitutional]; *Lightman v Flaum*, 179 Misc 2d 1007, 1014-1015 [using neutral principles of law to sustain a claim for breach of fiduciary duty by a congregant against rabbis]; *F.G. v MacDonell*, 150 NJ 550, 559, 696 A2d 697, 701-702 [parishioner may maintain a cause of action for

breach of fiduciary duty against her rector for initiating and sustaining sexual relationship in context of pastoral counseling relationship]; *Moses v Diocese of Colo.,* 863 P2d 310, 319-321 [Colo], *supra* [using neutral principles of law to uphold findings of liability against diocese and bishop for breach of fiduciary duty based on sexual relationship between assistant priest and parishioner in counseling setting]; *cf., Sanders v Casa View Baptist Church,* 134 F3d 331, 336-337, *cert denied* 525 US 868 [ecclesiastical inquiries unnecessary to uphold finding of breach of fiduciary duty against minister for sexual relations in the counseling setting, as he held himself out to possess qualifications of professional marital counselor, and stating "the constitutional guarantee of religious freedom cannot be construed to protect secular beliefs and behavior, even when they comprise part of an otherwise religious relationship between a minister and a member of his or her congregation. To hold otherwise would impermissibly place a religious leader in a preferred position in our society"]).

In *F.G. v MacDonell* (150 NJ 550, 696 A2d 697, *supra*), the Supreme Court of New Jersey upheld a cause of action to recover damages for breach of fiduciary duty and explained the difference between that cause of action and one based on clergy malpractice, where a priest engaged in a sexual relationship with a parishioner-counselee: "[u]nlike an action for clergy malpractice, an action for breach of fiduciary duty *does not* require establishing a standard of care and its breach * * * Establishing a fiduciary duty essentially requires proof that a parishioner trusted and sought counseling from the pastor. A violation of that trust constitutes a breach of the duty" (*F.G. v MacDonell, supra,* at 565 [emphasis added]; *see also, Erickson v Christenson,* 99 Or App 104, 108, 781 P2d 383, 386 [noting distinction between two causes of action, and reinstating a cause of action based on breach of a confidential relationship against pastor who allegedly sexually abused plaintiff within counseling relationship]).

In *Moses v Diocese of Colo.* (863 P2d 310, *supra*), the Supreme Court of Colorado referred to its earlier opinion in *Destefano v Grabrian* (763 P2d 275 [Colo]) which upheld a cause of action based on breach of fiduciary duty against a priest who allegedly had sexual relations with a parishioner-counselee, and explained: "*Destefano* held that a cause of action for breach of fiduciary duty was separate and distinct from a claim of clergy malpractice. The fundamental difference between the two causes of action is the former is a breach of trust and does not require a professional relationship or a professional standard

of care, while the latter is an action for negligence based on a professional relationship and a professional standard of care. In *Destefano*, we held the defendant owed a fiduciary duty to the plaintiff that 'was created by his undertaking to counsel [the plaintiff].' *Destefano v. Grabrian* 763 P2d 275, 284 * * *. The position of trust occupied by the defendant, when coupled with his positive act of counseling the plaintiff, resulted in a duty to the plaintiff. The relevant common facts in *Destefano* and [this] case are *not* the profession of the defendants; *the relevant facts are that the defendants in both cases occupied a position of superiority, assumed a duty to act in good faith, and then breached their duty*. In Colorado, breach of fiduciary duty is actionable, clergy malpractice is not. *Id.*, at 284-86" (*Moses v Diocese of Colo., supra*, at 321, n 13 [emphasis added]).

In upholding a jury's finding that a diocese had breached its fiduciary duty where a priest had sexually abused a plaintiff-parishioner, another court distinguished the two causes of action in a different manner: "This Court perceives error in a *per se* analogy of a fiduciary duty claim to one of clergy malpractice, in that while the clergy malpractice claim may require the development of a 'reasonable clergy' standard, the fiduciary duty claim does not necessarily require such an inquiry inasmuch as the standard to which a fiduciary is held is not that of a 'reasonable clergy person' * * * but rather that of a 'fiduciary.' In other words, rather than being restricted to consideration of a standard of care to be followed by clergy persons or other religious entities, a court or jury can, in some circumstances, measure a religious organization's or official's conduct by pre-existing secular standards of care to which all fiduciaries are held" (*Martinelli v Bridgeport R. C. Diocesan Corp.*, 10 F Supp 2d 138, 146). The court in *Schmidt v Bishop* (779 F Supp 321, 324), cited by the Majority, simply did not consider the distinctions which the above-cited authorities found persuasive and with which I emphatically agree.

Of course, for purposes of determining liability, the question of whether a relationship is a fiduciary one is a question of fact for the jury (*see, Penato v George,* 52 AD2d 939, 942). I conclude that the Supreme Court erred by misapplying the "neutral principles of law" doctrine when it held that no jury could find a fiduciary relationship here without having to consider religious facts. The issue of whether a fiduciary duty exists demands an examination of the facts of a case from a secular vantage point, and without reliance on religious precepts (*see, First Presbyt. Church v United Presbyt. Church,* 62 NY2d 110, *supra*, at 122), but does not ask a finder of fact to strip a

litigant's narrative of all religious nuance. Here, a jury need not consider such issues as the legitimacy of Langford's beliefs and the nature of the healing powers of the church, as the conduct complained of is not related to any doctrine of the Catholic faith, nor does Sivillo claim that it is at all related to any religious entity's doctrine or that the conduct interferes with his free exercise of religion. Using neutral principles of law, premised upon neutral facts, a court can allow a jury to determine that Sivillo acquired influence over Langford by virtue of his role as an established religious leader, that he abused his influence and her trust by demanding a sexual relationship while warning her that only he prevented her physical condition from severely deteriorating. These findings would require no inquiry into the doctrine of the Catholic Church and would thus not violate the First Amendment. It has not been, and cannot be claimed that a religious entity is immunized by the First Amendment from liability resulting from tortious conduct (*see, Kenneth R. v Roman Catholic Diocese,* 229 AD2d 159, *cert denied* 522 US 967).

The relationship between priest and parishioner is as clearly fiduciary as any relationship between two individuals in our society. To hold otherwise would deny the morality and the purpose of religious institutions. Indeed, the definition of fiduciary relationship enunciated by this Court in *Penato v George* (52 AD2d 939, *supra*), can only be read to include relationships between clergy and parishioner. There we defined a fiduciary relationship as: "one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another * * * Such a relationship might be found to exist, in appropriate circumstances, between close friends * * * or even where confidence is based upon prior business dealings" (*Penato v George, supra,* at 942).

The hallmark of fiduciary duty—an imbalance of power between the parties, is especially manifest in the relationship between priest and parishioner, here Sivillo and Langford. Not only did Sivillo hold the position of respect and influence as Langford's priest, her "lifeline to God", but she was extraordinarily vulnerable, weakened by physical illness, facing the onset of blindness and loss of mobility, depressed and anxious to the point of considering suicide, lonely and without other re-

sources. The power of his promises to save her, her dependence on his companionship and solicitude, and her fear of his threats if she failed to comply were irresistible. She was an exceptionally easy victim (*see,* Cooper-White, *Soul-Stealing: Power Relations in Pastoral Sexual Abuse,* Christian Century, vol 108, No. 6, Feb. 20, 1991, at 197 ["The clergy role carries a great deal of power in and of itself, and one of the most insidious aspects of that power is the role of 'man of God' "]).

## THE PUBLIC INTEREST

This case concerns far more than Langford's claim against Sivillo. It presents this Court with the opportunity to establish a deterrent to conduct that inflicts immeasurable harm upon victims who are deceived and abused by the religious leaders that they are taught to trust and depend upon from early childhood. Clearly Langford's claim is not unique. That sexual abuse of religious adherents is committed by religious leaders across the globe, and in faiths ranging from Christianity to Judaism to Buddhism has been well documented (*see,* Villiers, *Clergy Malpractice Revisited: Liability for Sexual Misconduct in the Counseling Relationship,* 74 Denv U L Rev 1, 64, n 89). "Surveys of 300 clergy from four U.S. Christian denominations (Assemblies of God, Episcopal Church U.S.A., Presbyterian Church U.S.A., and United Methodist), reported that 38% admitted to some form of sexual contact with a member of their congregation * * * An astonishing 76% said they knew of another clergy member who had engaged in sexual intercourse with a congregant" (Villiers, *Clergy Malpractice Revisited: Liability for Sexual Misconduct in the Counseling Relationship, id.,* at 64, n 87). "A policy report of the Presbyterian Church (U.S.A.) reported that 'between 10 and 23 percent of clergy nationwide have engaged in sexualized behavior or sexual contact with parishioners, clients or employees * * * within a professional relationship' " (Villiers, *Clergy Malpractice Revisited: Liability for Sexual Misconduct in the Counseling Relationship, ibid,* quoting *Presbyterians Adopt Guidelines to Curb Sex Misconduct by Clergy,* NY Times, June 12, 1991, *see also,* O'Reilly and Strasser, *Clergy Sexual Misconduct: Confronting the Difficult Constitutional and Institutional Liability Issues,* 7 St Thomas L Rev 31, 33-34). Moreover, as with all incidents of sexual abuse, many victims undoubtedly fear to come forward due to a misguided sense of guilt, fear of ostracism by the community, or retaliation by the clergy member.

In recognizing Langford's cause of action to recover damages for breach of fiduciary duty, it would, for the first time, pose a

deterrent to other predatory members of the clergy who presently have too little reason to fear personal retribution for their conduct causing grave injury to their victims.

For the above stated reasons, I would modify and permit Langford to pursue her cause of action against Sivillo based on breach of fiduciary duty.