**Karl EHRENS, Plaintiff,**

v.

**THE LUTHERAN CHURCH–MISSOURI SYNOD, the Lutheran Church–Missouri Synod Atlantic District and Ronald F. Fink, Individually and as President of the Lutheran Church–Missouri Synod Atlantic District Defendants.**

**No. 02 CIV. 2771(CLB).**

United States District Court, S.D. New York.

June 18, 2003.

David B. Stein, Rubin Weisman, Colasanti, Kajko & Stein, LLP, Lexington, MA, John Haris, Epstein, Becker and Green, New York City, for plaintiff.

Renee Simon Lesser, New York City, for defendant.

### Memorandum and Order

BRIEANT, District Judge.

In this diversity case controlled by New York law, seeking damages for sexual abuse of a minor, Defendants move for summary judgment pursuant to Fed. R.Civ.P. 56 on various grounds.[1] The motion was heard and fully submitted on May 23, 2003.

The following facts are not in dispute except as noted. Plaintiff Karl Ehrens ("Ehrens") is a citizen of Wollaston, Massachusetts. Defendant The Lutheran Church–Missouri Synod is a national religious organization with its principal place of business in St. Louis, Missouri. Defendant The Lutheran Church–Missouri Syn-

---

1. This action was originally filed in Bronx County Supreme Court on November 19, 2001. Pursuant to 28 U.S.C. § 1441, Defendants removed this action to this Court based on diversity of citizenship, 28 U.S.C. § 1332(a)(1).

od Atlantic District is a religious organization conducting business within the State of New York and having its principal office in Bronxville, New York. The Individual Defendant, Reverend Ronald F. Fink ("Rev.Fink"), was President of the Lutheran Church–Missouri Synod Atlantic District until 1989 and is a resident of the State of North Carolina.[2]

The complaint pleads two claims against Defendant The Lutheran Church Missouri Synod framed as claims for negligence imposing responsibility for the wrongful conduct of Reverend Frederick Chapman, not sued, and now deceased, (count I), and negligent infliction of emotional distress (count II). These same two claims are alleged separately against Defendant The Lutheran Church Missouri Synod—Atlantic District. Plaintiff characterizes his claims as for "negligent hiring, supervision or retention" of a clergyman. See Plaintiff's Opposition brief filed May 14, 2003 at 10.

Because Reverend Fink was not served with process the action is dismissed against him at the outset and the counts pleaded against him are not considered.

### Factual Background

Our analysis must be based on the facts well pleaded as amplified by the affidavits and exhibits, without regard to the legal theories or labels attached by the pleader. The facts, denied by Defendants, but assumed to be true for purposes of the motion, are found in the Plaintiff's complaint and brief in opposition (Doc. 24).

Some knowledge of the history and organization of the Lutheran Church in America is necessary to resolve the motion. Defendants take their name from

the Rev. Dr. Martin Luther (1483–1546) a Roman Catholic priest whose act in posting his *95 theses* on the church door in Wittenberg, in what is now Germany, on October 31, 1517, causes that day to be considered as the "Birthday of the Protestant Reformation". The *95 theses* are also known as the *Lutheran Confessions*. The Lutheran Church itself was founded June 25, 1530. Its origin and growth parallel that of the Presbyterian Church, said to have been founded in Scotland by John Knox (1514–1572) and the Reformation of the Anglican Church under the leadership of Archbishop Thomas Cranmer (1489–1556) in England, and other subsequent European Protestant denominations.

Lutherans today are the third largest grouping of Christians, worldwide. Defendant Lutheran Church—Missouri Synod ("the Synod") was organized in 1847 and is but one of a number of similar bodies which constitute a unity, for purposes of self-government of their constituent member Lutheran churches in the United States and Canada. Defendant The Lutheran Church—Missouri Synod—Atlantic District, is an administrative facility within the Synod responsible for approximately 100 congregations in Metropolitan New York, Long Island and Eastern New York State. Massachusetts is within the New England District of the Synod.

Under the governance of the Synod, a congregation cannot become a member of the Synod until its Constitution and bylaws are approved by a District of the Synod. The Wollaston Church discussed *infra* was not a member of the Atlantic District although it did belong to the Missouri Synod.

---

**2.** Defendant Fink has never been served with the summons and complaint in this action. The time to serve him has passed. Plaintiff has waived his opportunity to depose Rev. Fink. He was required by a prior direction of this Court to depose him by March 14, 2003 and did not do so.

A congregation may "call" (retain or employ) only ordained and commissioned workers who are members of the Synod. This requirement applies to a Pastor, as well as certain other church offices not material to this action. The right to call a Pastor remains exclusively with the Congregation, but one so called must be endorsed by and a member of the Synod. Such a person eligible to serve as a Pastor is said to be "rostered", in that his name appears on a list or roster of eligible priests maintained by the Synod. A Pastor once called may be removed from office only for cause by a two-thirds vote of the members of the congregation assembled. Neither the Synod nor the District has the power to remove a Pastor once called.

Reverend Frederick Chapman, now deceased, was Pastor of a Lutheran church in Laurelton, New York. Chapman served in the Atlantic District as a Pastor until 1981. At that time he requested and was granted *emeritus* (retired) status and moved to New England. His roster membership was subsequently transferred to the New England District, and Rev. Fink had no further contact with him of any kind. Reverend Chapman resigned from the national clergy roster in 1997. Frederick Chapman was retired on pension as of 1978 or 1979. Although retired he continued to remain on the roster and to serve at the Wollaston Church, until 1997.

Plaintiff Karl Ehrens was a member of Wollaston Lutheran Church, in the New England District. Plaintiff alleges that beginning in the Spring of 1994 until July 1995, while he was under age, Chapman took advantage of his pastoral role within the church (as Pastor Emeritus at Wollaston) and began to develop an inappropriate sexual relationship with Ehrens. Ehrens alleges that while he was alone with Ehrens, Chapman committed a series of sexual assaults upon him. Chapman was convicted in 1997 in Massachusetts on criminal charges relating to that misconduct.

Defendant Synod provides evidence that it was not until 1997 that the Atlantic District learned of allegations of sexual misconduct lodged against Frederick Chapman in Massachusetts. "No allegations of sexual misconduct are on record in the Atlantic District office." Exhibit B. There is no evidence to the contrary. Since, organizationally, the District is part of the Synod, its knowledge would be imputed to the Synod.

### Discussion

F.R.Civ.P. 56 provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

Plaintiff's legal theory is that Defendants employed or supervised or retained Chapman as a Pastor in a position of trust with the knowledge that he had a history of sexually assaulting minors. Plaintiff alleges that in 1977, while serving as Pastor in New York, Chapman was forced to leave that post because of inappropriate behavior towards female members including minors. Reverend Ronald Fink was the President of the Atlantic District in 1977 and is claimed to have had personal knowledge concerning that misconduct. In August 1980, in connection with Chapman's transfer to the New England District, Rev. Fink failed to inform the New

England District of Chapman's prior misconduct, and Defendants allowed him to remain rostered, knowing that during his ministry in the New England District, Chapman would have unsupervised access to children, including Plaintiff. This failure is alleged to be the cause of Plaintiff's injuries which are the subject of the suit.

This Court agrees that Plaintiff's allegation that Chapman was "working for the Atlantic District" at the time of the alleged assaults is not supported by the evidence, and indeed is contradicted by his claims previously filed by Mr. Ehrens in his two prior lawsuits in Massachusetts.

■ Defendants point out, and this Court agrees that the Court is prevented by the First Amendment to the United States Constitution from determining, after the fact, that the ecclesiastical authorities of the Lutheran Church negligently supervised or retained a clergyman, as Plaintiff contends. It is constitutionally dubious for a court or jury to set a standard of reasonable care for religious bodies which maintain rosters of clergy eligibility for employment by congregations. New York courts have ruled that "any attempt to define the duty of care owed by a member of the clergy to a parishioner fosters excessive entanglement with religion." *Langford v. Roman Catholic Diocese,* 271 A.D.2d 494, 705 N.Y.S.2d 661, 662 (2d Dep't 2000). The same is true with regard to the duty of care in determining the continued eligibility of a priest to serve as a Pastor. As this Court has previously held in *Schmidt v. Bishop,* 779 F.Supp. 321 (S.D.N.Y.1991) in which Plaintiff's claims against the Church Defendants were dismissed as a matter of law:

"Any inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises the same kind of First Amendment problems of entanglement .... which might

involve the Court in making sensitive judgments about the propriety of the Church Defendants' supervision in light of their religious beliefs. Insofar as concerns retention or supervision, the pastor of a Presbyterian Church is not analogous to a common law employee. He may not demit his charge nor be removed by the session, without the consent of the presbytery, functioning essentially as an ecclesiastical court. The traditional denominations each have their own intricate principles of governance, as to which the state has no rights of visitation. Church governance is founded in scripture, modified by reformers over almost two millenia.

As the Supreme Court stated long before the *Lemon* formulation was developed: It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so. *Watson v. Jones,* 80 U.S. 679, 13 Wall. 679, 729, 20 L.Ed. 666 (1871). *See also St. Nicholas Cathedral of Russian Orthodox Church of North America v. Kedroff,* 302 N.Y. 1, 13, 96 N.E.2d 56 (1950) rev'd on other grounds, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952)".

The so-called "third prong" of the much maligned case of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) which forbade the state to "foster excessive government entanglement with religion" remains valid. We know from history that the First Amendment was passed in light of concern by Congress and the states that their new national government might at some future time follow the practices of European states in which the

ruler for the time being presumed to dictate the religious affiliations of his subjects and interfere with the free exercise of their own conscience. We may not forget that "the men and women who left Scrooby for Leyden and eventually came to Plymouth in order to worship God where they wished and in their own way must have thought they had terminated the interference of public authorities with free and unhandicapped exercise of religion."[3]

Any effort of this Court to instruct the trial jury as to the duty of care by which a denomination keeps its "roster" of those priests (and others) authorized to accept canonical employment by a parish church would of necessity require the court and jury to consider the fundamental perspective and approach to ordination and supervision of clergy and constituent churches inherent in the beliefs and practices of the particular denomination. The selection and deployment of clergy is about as central to the life and purpose of a group of affiliated churches as anything we can imagine. The mainstream denominations differ greatly in their rules and policies for "calling" and removing clergy. For a court to intervene to set standards of care for the performance of this work, which is founded in scripture and in history, implicating apostolic succession in some denominations, is as unconstitutional as it is impossible. When such intervention is directed to retention, the problem becomes worse and such claims become a pleading substitute for the doctrine of *respondent superior*, inapplicable in New York to crimes committed by clergy, and not alleged by Plaintiff in this case. *Bassile v. Covenant House*, 152 Misc.2d 88, 575 N.Y.S.2d 233 (1991); *Joshua S. v. Casey*, 206 A.D.2d 839, 615 N.Y.S.2d 200 (App. Div. 4th Dept.1994); *Paul J.H. v. Lum*,

291 A.D.2d 894, 736 N.Y.S.2d 561 (App. Div. 4th Dept.2002)

Any award of damages would have a chilling effect, leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the establishment clause. Because it would be inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently supervised or retained Reverend Chapman, this case must be dismissed.

■ Defendants also contend alternatively that there is no proof of prior notice to them that Chapman would commit a sexual assault against a young man sixteen years after he left the Atlantic District and moved to Massachusetts, simply by reason of a prior history of misconduct of an unspecified sexual nature years earlier with women.

■ Under New York law, to establish a *prima facie* case of negligence, the following must be shown: (i) a duty owed to the plaintiff; (ii) a breach of that duty; (iii) "a reasonably close causal connection between the contact and the resulting injury", and (iv) "actual loss, harm or damage." See *Dooner v. Keefe, Bruyette & Woods, Inc.*, 157 F.Supp.2d 265 (S.D.N.Y. 2001). Plaintiff's evidence fails to satisfy the essential elements necessary to prevail in an action for negligence.

Plaintiff argues that Defendants knew of "Chapman's pedophilic activities...[as] confirmed by Chapman's subsequent conviction." See Id. at ¶ 7. The conviction of Chapman occurred after the alleged assault in 1994. See Id. at ¶ 18. It is illogical that Chapman's post–1994 conviction could be used to create a foreseeable duty

---

**3.** Chief Judge Albert Conway writing for the New York Court of Appeals in *Matter of Community Synagogue v. Bates*, 1 N.Y.2d 445, 458, 154 N.Y.S.2d 15, 136 N.E.2d 488 (1956).

of care on the part of the Atlantic District and the Synod dating back to 1980, when Chapman's membership in the Atlantic District ended.[4]

Plaintiff has not pointed to admissible evidence that either the Synod or the Atlantic District had requisite notice of Chapman's alleged proclivities to commit sexual assault. See Def. Memo at p. 14.

To state a claim under New York law for negligent hiring, supervision, and retention, the plaintiff must show that "the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Wilson v. the Diocese of New York of the Episcopal Church,* 1998 WL 82921, *3, 1998 U.S. Dist. LEXIS 2051 *10 (S.D.N.Y. Feb. 23, 1998); *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 229 A.D.2d 159, 654 N.Y.S.2d 791, 793 (2d Dep't), cert. denied, 522 U.S. 967, 118 S.Ct. 413, 139 L.Ed.2d 316 (1997). There must be evidence to establish that the employer knew or should have known of any alleged propensity on Chapman's part to commit sexual assault both prior to hiring him and throughout the period of his employment. See *Kenneth R.,* 654 N.Y.S.2d at 795 ("There is no common-law duty to institute specific procedures for hiring employees unless the employer knows of facts that would lead a reasonably prudent person to investigate the prospective employee.").

Plaintiff directs this Court to a June 2, 1994 letter (Pl. Mem. in Opp. Ex. 8) concerning the evaluation of Chapman by a psychologist Dr. David B. Doolittle. The letter makes a reference to "a previous incident of [Chapman] touching a child... on the leg in about 1976." See Id. Absent from the letter is whether the De-

fendants had knowledge of the incident. Plaintiff also refers to two letters in 1977 and 1978, one from Reverend Fink and one from Frederick Chapman. These letters refer to a serious problem concerning Chapman. They do not indicate that the problem was related to child molestation. Reverend Fink addressed this letter in his affidavit:

> I have reviewed a September 12, 1977 letter I wrote to the President of the Iowa District West concerning Mr. Chapman. In that letter, I noted I was not enclosing a "Confidential Information Blank" (which is a form that has basic *curriculum vitae* and background information about clergy members) because of what I described as a "serious problem" that had "not yet been resolved". The "serious problem" I was referring to did not involve any inappropriate behavior on the part of Mr. Chapman towards any members of any congregation, and it certainly did not involve any immoral or illegal acts on the part of Mr. Chapman.

\*   \*   \*   \*   \*   \*

Moreover, Fink's affidavit dated December 6, 2002 states:

> "Prior to the lawsuit commenced by the plaintiff in Massachusetts, I knew of no allegations, complaints, charges or claims concerning Mr. Chapman's conduct, let alone any claim or allegation that he engaged in any purported 'inappropriate behavior toward female members of the Church, including minors' as alleged in the complaint filed in this action."

Reverend Fink Aff. 56.1 Ex. K ¶ 6.

Defendants show that "on or about July 27, 1977, Mr. Chapman submitted a letter

---

4. The pre-sentence report used in connection with Chapman's Massachusetts conviction contains reference to an unidentified prior conviction of a sexual nature in New York. The report is not admissible evidence that such a conviction exists or that these Defendants knew of it at the time Chapman was called by the Wollaston Church.

informing Mr. Fink of his decision to resign from the pastorate of the Laurelton [New York] parish. The reason given for his resignation was due to a change in the ethnic [racial] makeup of the parishioners." See Doc. 11, Exhibit E, ¶ 3.

Because there is no evidence of notice which would support the existence of a duty to disclose, there is no negligence. Because, as noted earlier, these Defendants lack the power to remove a Pastor from a Congregation, there is no claim for negligent retention.

For the foregoing reasons, the motion is granted. The Clerk shall file a final judgment.

SO ORDERED.