234 P.3d 299 (2010)
Angela ERDMAN, Appellant,
v.
CHAPEL HILL PRESBYTERIAN CHURCH; Mark J. Toone, individually; and the marital community of Mark J. Toone and Jane Doe Toone, Respondents.
No. 40247-5-II.
Court of Appeals of Washington, Division 2.
June 29, 2010.
As Amended on Denial of Reconsideration July 28, 2010.
*301 Robin Williams Phillips, Sean Vincent Small, Lasher Holzapfel Sperry & Ebberson PLLC, Seattle, WA, for Appellant.
Elizabeth Pike Martin, Gordon Thomas Honeywell et al, William A. Coats, Daniel C. Montopoli, Attorneys at Law, Tacoma, WA, for Respondents.
Elizabeth Pike Martin, Gordon Thomas Honeywell et al, Tacoma, WA, for Amicus Curiae on behalf of Presbytery of Olympia.
HOUGHTON, J.P.T.[1]
¶ 1 Angela Erdman appeals the trial court's order dismissing her claims against Chapel Hill Presbyterian Church (Church) and its pastor, Mark Toone. She argues that the trial court erred in limiting discovery and in granting summary judgment. She also argues that RCW 49.60.040(11), the religious employer exemption under chapter 49.60 RCW, the Washington Law against Discrimination (WLAD), violates the state and federal constitutions. We affirm in part, reverse in part, and remand for further proceedings.

FACTS
¶ 2 In 2003, Erdman became a Church elder. As an elder, she took ordination vows *302 in which she agreed to the Church's dispute resolution and disciplinary procedures.
¶ 3 In 2005, the Church hired Erdman as its Executive for Stewardship. The Church's job description for this position sets forth duties such as assisting with the development of the Church's vision, goals, and strategies; providing strategic leadership; assisting with decisions about the Church's financial and development strategies and goals; and creating a major donor development plan for the Church. The position did not require candidates to be an elder or to belong to the Church.
¶ 4 According to Erdman, her job generally involved developing the Church's annual budget, including managing an accounting and finance team; managing a department "responsible for all "accounting, payroll, tax, pricing, and banking functions;" and providing business case analysis, reviews, reports, and income statements to the Church and its lenders. Clerk's Papers (CP) at 317. The Church did not authorize her to administer sacraments or to conduct religious services as part of her position.
¶ 5 This case arises from Erdman's belief that tours of religious and historical sites led by Toone, the Church's senior pastor, possibly jeopardized the Church's tax exempt status. In September 2007, Erdman asked Toone to discuss her concerns about the tours. He assured her that the tours comported with the Church's mission and that many clergy followed this common ministry practice. He told her that he had also read documents she supplied regarding the issue and had discussed the matter with his accountant, who advised that the tours did not threaten the Church's tax exempt status.
¶ 6 On October 16, 2007, Toone sent Erdman an email stating that discussions between his and the Church's accountant assured him that the tours were proper and that he wanted to "close the loop" on the issue. CP (filed Oct. 28, 2009) at 829. Erdman responded twice, requesting Toone meet with her to discuss the tours.
¶ 7 On October 17, Toone met with Erdman. According to her, Toone stormed into her office; slammed the door; and proceeded to harass, physically intimidate, and verbally abuse her for 25 minutes.[2] Toone told her that the tours were proper, that her continued questioning was insubordination, and that she had unfairly impugned his reputation. That same day, she notified the Church's human resource director that she would not return to work in the near future. She also submitted a written complaint against Toone to the Church's human resource director.[3] On October 29, she took formal medical leave.
¶ 8 To resolve the dispute, Toone suspended all promotional activity for an upcoming tour and agreed to turn the matter over to the Church's governing body, the Session. A Session Committee, eventually comprising of five Church elders, met with Erdman to hear her concerns, review the tours, and address the interpersonal issues between her and Toone.
¶ 9 On November 30, Erdman contacted the Church, stating that her doctor had cleared her to return to work. The Church responded by placing her on administrative leave with pay, pending the Session Committee's investigation. In December, before the Session Committee completed its investigation, Erdman filed a grievance against Toone with the Presbytery of Olympia (Presbytery), the regional governing body of the Presbyterian Church. She based her grievance on her interpretation of the tour issue and on Toone's physical intimidation; verbal abuse; and threats about her job, including placing her on administrative leave.
¶ 10 On December 27, the Session Committee issued a report concluding that Toone *303 properly conducted his tours and that he did not harass or intimidate Erdman. The Session Committee also concluded that Erdman's implied threats through her attorney, false statements, and dissemination of disparaging emails throughout the investigation violated her ordination vows and the Church's scriptural teachings. Based on the Session Committee's conclusions and recommendation, the Church terminated Erdman's employment on December 31.
¶ 11 In January 2008, Erdman resubmitted her grievance to the Presbytery using its proper Form No. 26. In her Form No. 26 grievance, she accused Toone of violating scripture and Church law in (1) leading the tours, (2) physically intimidating her, (3) verbally abusing and harassing her, and (4) retaliating against her. Although in her Form No. 26 grievance, she did not set forth specific allegations against the Church, she claimed that Toone worked with the Session to prevent "full disclosure of truth" regarding the tours and that "significant portions" of the Session Committee's report bore "false witness and distortion of truth." CP (filed Oct. 28, 2009) at 845-46.
¶ 12 In response to Erdman's Form No. 26 grievance, the Presbytery appointed an Investigative Committee. After reviewing the matter, the Investigative Committee concluded that Erdman could not substantiate her allegations and declined to "fil[e] charges" against Toone. CP (filed Oct. 28, 2009) at 848. The Presbyterian Church's Book of Order (2007-2009) reserved Erdman's right to appeal the Investigative Committee's decision.
¶ 13 Erdman did not appeal. Instead, she sued Toone[4] and the Church. Toone and the Church moved for summary judgment. In response, Erdman amended her complaint, raising state law claims based on (1) negligent retention, (2) negligent supervision, (3) violations of the WLAD, (4) intentional infliction of emotional distress, (5) negligent infliction of emotional distress, (6) wrongful discharge, (7) wrongful termination in violation of public policy, (8) retaliation, and (9) wrongful withholding of wages. Her amended complaint also raised federal law claims under Title VII of the Civil Rights Act of 1964 based on (1) religious and sexual discrimination, (2) harassment, (3) hostile work environment, and (4) retaliation. 42 U.S.C. § 2000e-2(a)(1).
¶ 14 Before the trial court ruled on the summary judgment motion, Erdman moved to compel the deposition of an Investigative Committee member and production of that Committee's investigation documents. The Church, Toone, and the Presbytery objected, arguing that granting the motions to compel would interfere with the Church's constitutionally protected authority to resolve Church discipline matters in ecclesiastical tribunals.[5]
¶ 15 The trial court reviewed the Investigative Committee's documents in camera.[6] It found that the First Amendment protected the Investigative Committee's thought processes contained in the documents and that Erdman had failed to demonstrate the required necessity for discovery. Although the trial court denied Erdman's motion to compel production of the documents, it granted her motion to compel the deposition of an Investigative Committee member. In doing so, it noted that no inquiry could be made into the Investigative Committee's thought processes. The trial court also found that the documents established that the Investigative Committee had considered each of Erdman's Form No. 26 grievance allegations.
¶ 16 After the deposition was taken, the Church and Toone renewed their motion for summary judgment. They argued that Erdman was a pastor and the ministerial *304 exception[7] applied depriving the trial court of jurisdiction to resolve disputes involving the relationship between the Church and its ministers. They further argued that the WLAD exempts religious organizations from its prohibitions.
¶ 17 After hearing argument, the trial court stated that it lacked sufficient facts to decide whether Erdman was a minister and declined to rule in the defendant's favor on the ministerial exception.[8] It further dismissed Erdman's intentional infliction of emotional distress (outrage) claims because she failed to meet the relevant legal standards.
¶ 18 Relying on the Division One decision in Elvig v. Ackles, 123 Wash.App. 491, 98 P.3d 524 (2004), the trial court also addressed the viability of certain claims under the ecclesiastical abstention doctrine.[9] It dismissed all claims that were based on facts that had been set forth in Erdman's Form No. 26 grievance. The trial court stated that "the decisions made by the [ecclesiastical] tribunal and the matters decided by the tribunal, claims based on those facts are barred." Verbatim Transcript of Proceedings at 25.
¶ 19 As a result, the trial court dismissed Erdman's negligent retention, negligent supervision, wrongful discharge, wrongful termination in violation of public policy, retaliation, negligent infliction of emotional distress, and federal law claims that were based on facts set forth in the grievance. It declined to dismiss her retaliation, negligent infliction of emotional distress, and willful withholding of wages claims that were not based on facts raised in her Form No. 26 grievance.
¶ 20 After Erdman voluntarily dismissed her remaining claims, she sought direct review in our Supreme Court. That court declined review and transferred the matter to us.

ANALYSIS

Motions to Compel Discovery
¶ 21 Erdman first contends that the trial court erred in denying her motion to compel production of documents. She also appeals its limitations on deposition questioning of an Investigative Committee member.
¶ 22 We review a trial court's discovery rulings under an abuse of discretion standard. T.S. v. Boy Scouts of Am., 157 Wash.2d 416, 423, 138 P.3d 1053 (2006). A trial court abuses its discretion when it bases its decision on untenable or unreasonable grounds. T.S., 157 Wash.2d at 423, 138 P.3d 1053.
¶ 23 Without citation to authority or to a record, Erdman argues that the trial court erred by excluding Investigative Committee documents reviewed in camera from discovery and by partially relying on those documents in granting summary judgment. We will not review this claimed error because Erdman failed to provide authority supporting her argument or to secure these documents for our review. See RAP 9.2(b) (appellant bears the burden of perfecting the record so that the reviewing court has before it all of the evidence relevant to the issue and matters not in the record will not be considered); RAP 10.3(a)(6) (parties must provide citation to authority supporting their arguments).
*305 ¶ 24 Erdman also argues that the trial court improperly limited discovery through deposition testimony. We disagree.
¶ 25 The trial court foreclosed inquiry into the Investigative Committee's thought processes during discovery. We note that Erdman based her claims before the Committee entirely on scripture violations. Because inquiries into "the mind of the church" create an unconstitutional governmental entanglement with the church, the trial court did not abuse its discretion and Erdman's argument fails. Rayburn v. Gen. Conference of Seventh-Day Adventists, 772 F.2d 1164, 1171 (4th Cir.1985) (subjecting church decisions involving spiritual functions to the "full panoply of legal process" violates the First Amendment).

Ecclesiastical Abstention
¶ 26 Erdman next contends that the trial court erred in granting partial summary judgment based on ecclesiastical abstention. She asserts that it should not have dismissed her claims that were based on facts set forth in the Form No. 26 grievance because her claims involve secular issues and thus the Investigative Committee's decision does not bind civil courts.
¶ 27 We review an order granting summary judgment de novo. Campbell v. Ticor Title Ins. Co., 166 Wash.2d 466, 470, 209 P.3d 859 (2009). When reviewing a summary judgment order, we take the evidence in a light most favorable to the nonmoving party. Herron v. Tribune Publ'g Co., 108 Wash.2d 162, 170, 736 P.2d 249 (1987). A trial court properly grants summary judgment when no genuine issues of material fact preclude it. CR 56(c).
¶ 28 The trial court relied on Division One's Elvig opinion, 123 Wash.App. at 491, 98 P.3d 524, as authority compelling it to dismiss all of Erdman's claims.[10] In Elvig, an associate minister filed sexual misconduct complaints with the church about its pastor. Elvig, 123 Wash.App. at 493-94, 98 P.3d 524. An investigative committee conducted an inquiry and decided not to act against the pastor. Elvig, 123 Wash.App. at 494, 98 P.3d 524. Elvig appealed to the Permanent Judicial Commission, the Presbytery's highest adjudicatory body, and it affirmed the decision. Elvig, 123 Wash.App. at 494, 98 P.3d 524. Elvig then brought numerous claims, including sexual harassment, retaliation, and negligent supervision against the church and its pastor in civil court. Elvig, 123 Wash. App. at 495, 98 P.3d 524. The trial court granted summary judgment in favor of the church and its pastor and dismissed all her claims except one, which she then voluntarily dismissed. Elvig, 123 Wash.App. at 495, 98 P.3d 524.
¶ 29 In affirming dismissal of Elvig's claims on appeal, Division One noted that
if the church accused of wrongdoing is a member of a hierarchically-organized church that has ecclesiastical judicial tribunals, civil courts must defer to the highest church tribunal's resolution of the matter, despite the fact that the dispute could be resolved by a civil court.
Elvig, 123 Wash.App. at 496, 98 P.3d 524. It further stated:
[A] civil court may adjudicate Elvig's claims only if: (1) liability would be based on secular conduct and would not require the court to interpret church doctrine or religious beliefs; (2) an ecclesiastical tribunal of a hierarchically-structured church has not already resolved the matter; and (3) Elvig's claims do not involve a church's ability to choose its ministers.
123 Wash.App. at 497, 98 P.3d 524 (footnote omitted). In setting forth this standard, the Elvig court relied on the United States Supreme Court decision in Watson v. Jones, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871).
¶ 30 In Watson, the Supreme Court explained the rationale for the ecclesiastical abstention doctrine:
As regards its use in the matters we have been discussing it may very well be conceded that if the General Assembly of the Presbyterian Church should undertake to try one of its members for murder, and *306 punish him with death or imprisonment, its sentence would be of no validity in a civil court or anywhere else. Or if it should at the instance of one of its members entertain jurisdiction as between him and another member as to their individual right to property, real or personal, the right in no sense depending on ecclesiastical questions, its decision would be utterly disregarded by any civil court where it might be set up. And it might be said in a certain general sense very justly, that it was because the General Assembly had no jurisdiction of the case. Illustrations of this character could be multiplied in which the proposition of the Kentucky court would be strictly applicable.
But it is a very different thing where a subject-matter of dispute, strictly and purely ecclesiastical in its character,a matter over which the civil courts exercise no jurisdiction,a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them, becomes the subject of its action.
80 U.S. at 732-33 (emphasis added).
¶ 31 Thus, the United States Supreme Court has interpreted the First Amendment to mandate that "civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical [structure] on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law" but not necessarily as to matters that fall outside these parameters. Serbian Eastern Orthodox Diocese for United States of Am. and Canada v. Milivojevich, 426 U.S. 696, 713, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). Washington courts have adopted the same rule in the property dispute context. In Presbytery of Seattle, Inc. v. Rohrbaugh, 79 Wash.2d 367, 373, 485 P.2d 615 (1971), our Supreme Court stated:
[W]here a right of property in an action before a civil court depends upon a question of doctrine, ecclesiastical law, rule or custom, or church government, and the question has been decided by the highest tribunal within the organization to which it has been carried, the civil court will accept that decision as conclusive.
Therefore, both federal and Washington courts abstain from asserting jurisdiction over civil claims solely dependent on interpretation of religious scripture or doctrine. See Milivojevich, 426 U.S. at 709, 96 S.Ct. 2372 (resolution of property dispute depended on resolution of religious dispute over bishop's defrockment); Rohrbaugh, 79 Wash.2d at 373, 485 P.2d 615.
¶ 32 Essentially, ecclesiastical abstention serves the constitutional purpose of maintaining separation of church and state, as well as the practical purpose of leaving interpretation of ecclesiastical law to the expert ecclesiastical authorities. Watson, 80 U.S. at 728-29. But this abstention does not, as the Watson and Milivojevich courts noted, apply in all circumstances.
¶ 33 Here, Erdman's claims against Toone and the Church involve prima facie elements of civil tort law, not ecclesiastical law.[11] Accordingly, we review each of Erdman's claims to determine whether the trial court properly granted summary judgment.

Negligent Infliction of Emotional Distress
¶ 34 Erdman contends that the trial court erred in dismissing her claims for negligent infliction of emotional distress against the Church.[12] We disagree.
¶ 35 As our Supreme Court has recognized,
"[t]he utility of permitting employers to handle workplace disputes outweighs the risk of harm to employees who may exhibit symptoms of emotional distress as a result. The employers, not the courts, are in the best position to determine whether such [workplace] disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all. While *307 such actions undoubtedly are stressful to impacted employees, the courts cannot guarantee a stress-free workplace."
Snyder v. Med. Serv. Corp., 145 Wash.2d 233, 245, 35 P.3d 1158 (2001) (quoting Bishop v. State, 77 Wash.App. 228, 234, 889 P.2d 959 (1995)). Therefore, employer disciplinary decisions in workplace personality disputes may not result in liability for negligent infliction of emotional distress. Snyder, 145 Wash.2d at 245-46, 35 P.3d 1158.
¶ 36 Here, the Session Committee investigated a dispute between Erdman and Toone. The Session Committee ultimately recommended termination based on the evaluation of her actions. Such an employment decision does not give rise to a negligent infliction claim against the Church. Therefore, the trial court properly dismissed Erdman's claims against the Church.
¶ 37 Erdman further contends that the trial court erred in dismissing her claims for Toone's negligent infliction of emotional distress based on his abusive behavior toward her. We agree.
¶ 38 As we discussed above, the ecclesiastical abstention doctrine did not bar such a claim against him. Here, this claim survives summary judgment.

Negligent Supervision And Retention
¶ 39 Erdman further contends that the trial court erred in dismissing her negligent retention and supervision claims against the Church based on its alleged failure to take action against its employee for inappropriate behavior and harassment. In analyzing her argument, we must determine whether allowing such a claim to proceed would violate the Free Exercise and Establishment Clauses of the First Amendment.[13]
¶ 40 State action, when applied to a church's religiously motivated activities, raises concerns under the First Amendment. Paul v. Watchtower Bible and Tract Soc'y of New York, Inc., 819 F.2d 875, 880 (9th Cir. 1987). The application of state laws, including common law tort rules, constitutes state action. Paul, 819 F.2d at 880. For example, the Free Exercise Clause prevents civil courts from intruding into ecclesiastical matters or interfering with governance of church affairs. Bollard v. Cal. Province of the Soc'y of Jesus, 196 F.3d 940, 947 (9th Cir.1999).
¶ 41 Similarly, the Establishment Clause prohibits "`excessive government entanglement with religion.'" Bollard, 196 F.3d at 948 (quoting Lemon v. Kurtzman, 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). Entanglement can take both substantive and procedural forms. Bollard, 196 F.3d at 948-49. Substantive entanglement can result, for example, from a civil court placing itself in the position of evaluating "`competing opinions on religious subjects.'" Bollard, 196 F.3d at 949 (quoting Equal Employment Opportunity Comm'n v. Catholic Univ. of Am., 83 F.3d 455, 465 (D.C.Cir.1996)). Procedural entanglement can result from "a protracted legal process pitting church and state as adversaries," especially when it would subject a church to "the full panoply of legal process designed to probe the mind of the church" in making religiously motivated decisions. Bollard, 196 F.3d at 949 (quoting Rayburn, 772 F.2d at 1171). The greatest risk of procedural entanglement exists when a substantive entanglement is at issue. Bollard, 196 F.3d at 949.
¶ 42 The Washington Supreme Court has stated that, in general, "[t]he First Amendment does not provide churches with absolute immunity to engage in tortious conduct. So long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, it does not offend constitutional principles." C.J.C. v. Corp. of the Catholic Bishop of Yakima, 138 Wash.2d 699, 728, 985 P.2d 262 (1999).
¶ 43 In C.J.C., for example, the court concluded that, under the circumstances, a church could owe a duty of reasonable care to prevent harm intentionally inflicted on children by a church worker. 138 Wash.2d *308 at 720, 727-28, 985 P.2d 262. Likewise, as the Ninth Circuit observed, a "generalized and diffuse concern for church autonomy, without more," did not bar imposing tortious liability on a church for sexual harassment perpetuated by a minister against another employee. Bollard, 196 F.3d at 948.
¶ 44 The Ninth Circuit offers an instructive analysis in Bollard. In its Free Exercise Clause analysis, it noted that, because the defendant condemned the sexual harassment alleged by the plaintiff as inconsistent with its beliefs, allowing the suit to proceed would not significantly impact its religious beliefs or doctrines. Bollard, 196 F.3d at 947. Further, it noted that the Free Exercise Clause ministerial exception did not apply even when a minister was the perpetrator of harassment because "the [defendant] most certainly [did] not claim that allowing harassment to continue unrectified is a method of choosing [its] clergy."[14]Bollard, 196 F.3d at 947.
¶ 45 Likewise, in its Establishment Clause analysis, the Bollard court reasoned that substantive entanglement was not at issue based on its Free Exercise Clause analysis. 196 F.3d at 949. And it reasoned that allowing the suit to proceed would involve only a limited inquiry into "the nature and severity of the harassment and what measures, if any, were taken by the Jesuits" to exercise reasonable care to prevent or correct it. Bollard, 196 F.3d at 950. Thus, it required the jury to make only secular judgments, not evaluate religious doctrine or the reasonableness of the [defendant's] religious practices. Bollard, 196 F.3d at 950. Therefore, it concluded that the procedural entanglement in allowing the suit to proceed did not rise to a level violating the Establishment Clause. Bollard, 196 F.3d at 950.
¶ 46 Analyzing this case under Bollard, we first note that the church has not offered a religious justification for Toone's alleged tortious acts. Instead, it has denied that any misconduct occurred and argues that both the ministerial exception and ecclesiastical abstention bar consideration of Erdman's claims. Second, in its employee handbook, the Church specifically recognizes its prohibition against sexual harassment. Third, the Church's Book of Order states that the Session possesses responsibility "to provide for the administration of the program of the church, including ... fair employment practices." CP at 831. Thus, the Church's employment policies and church doctrine prohibit sexual harassment. Fourth, Erdman's negligent supervision and retention claims and the Church's potential defenses involve a limited, secular inquiry similar to the plaintiff's claims and potential defenses under Bollard.[15]
¶ 47 The First Amendment does not bar Erdman's negligent supervision and retention claims against the Church.[16] Thus, we remand for further proceedings.

*309 Title VII Claims
¶ 48 Erdman also argues that the trial court erred in dismissing her federal Title VII claims. She raised Title VII claims of discrimination, harassment, hostile work environment, and retaliation based on her gender and her religious beliefs.
¶ 49 We initially note that Title VII allows religious employers to discriminate based on religion. See 42 U.S.C. § 2000e-1(a). Further, there is no individual liability under Title VII. See Holly D. v. Cal. Inst. of Tech., 339 F.3d 1158, 1179 (9th Cir. 2003). Thus, Erdman's Title VII claims based on religious discrimination or harassment fail as a matter of law.
¶ 50 Nevertheless, her other Title VII claims against the Church do not fail. As the Bollard court held that the First Amendment did not bar the plaintiff's Title VII claims based on sexual harassment, they are similarly not barred here. 196 F.3d at 948, 950. Likewise, the Ninth Circuit has held that the First Amendment does not bar Title VII gender discrimination claims against religious employers that prohibit such discrimination, and it does not bar retaliation claims brought by non-ministerial employees. Equal Employment Opportunity Comm'n v. Pac. Press Publ'g Ass'n, 676 F.2d 1272, 1279, 1281 (9th Cir.1982), abrogated as recognized by American Friends Service Committee Corp. v. Thornburgh, 951 F.2d 957, 960 (9th Cir. 1991).[17] Therefore, we remand for further proceedings.

Washington Law Against Discrimination
¶ 51 Erdman further contends that the trial court erred in dismissing her claims under the WLAD due to its non-profit religious employer exemption, RCW 49.60.040(11). She also asserts that the statute is unconstitutional. We begin with the constitutionality argument.
¶ 52 We presume the constitutionality of RCW 49.60.040(11), which exempts non-profit religious employers from the WLAD. See City of Bellevue v. Lee, 166 Wash.2d 581, 585, 210 P.3d 1011 (2009). The statute provides:
"Employer" includes any person acting in the interest of an employer, directly or indirectly, who employs eight or more persons, and does not include any religious or sectarian organization not organized for private profit.
RCW 49.60.040(11).
¶ 53 Erdman raises two constitutional arguments. First, she asserts that the statute violates article I, section 12, the privileges and immunities clause of the Washington Constitution. Second, she asserts that the statute violates the equal protection clause of the federal constitution.
*310 ¶ 54 Initially, we note that Erdman cites no relevant authority regarding her article I, section 12 argument. She cites three cases: Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 280 n. 9, 285, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985), Grant County Fire Protection Dist. No. 5 v. City of Moses Lake, 150 Wash.2d 791, 813, 83 P.3d 419 (2004), and Duranceau v. City of Tacoma, 27 Wash.App. 777, 620 P.2d 533 (1980). Piper and Grant County establish only the existence of a fundamental right to pursue an occupation. Furthermore, our Supreme Court also has rejected the applicability of Duranceau and the proposition that the religious employer exemption is governmental interference with the fundamental right to pursue an occupation in violation of article I, section 12. Farnam v. CRISTA Ministries, 116 Wash.2d 659, 680-81, 807 P.2d 830 (1991). Thus, we do not further discuss this argument. RAP 10.3(a)(6).
¶ 55 Likewise, in Farnam, our Supreme Court noted that it has often considered the Washington constitution's privileges and immunities clause and the federal constitution's equal protection clause as one issue. 116 Wash.2d at 681, 807 P.2d 830. It observed that the United States Supreme Court reviewed and upheld the federal counterpart to Washington's religious employer exemption under a rational basis standard because the exemption created employer classes based on religion and provided a "uniform benefit to all religions" rationally related to the "legitimate governmental purpose" of prohibiting significant government interference with the free exercise of religion. Farnam, 116 Wash.2d at 681, 807 P.2d 830 (citing Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos, 483 U.S. 327, 339, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987)). Thus, we may infer from our Supreme Court's observations in Farnam that the WLAD's religious employer exemption would be subject to and would survive a rational basis review under the federal equal protection clause. Having rejected Erdman's constitutional arguments, we turn to reviewing the statute's application.
¶ 56 Erdman brought claims against the Church under the WLAD based on sexual and religious harassment and retaliation for reporting this harassment. She also brought common law claims based on wrongful termination and discharge and retaliation for reporting this harassment and her belief that Toone's actions violated tax laws.[18] The plain language of RCW 49.60.040(11) bars her harassment and wrongful discharge claims under the WLAD and the trial court properly dismissed them.
¶ 57 Furthermore, Erdman's common law claims for retaliation,[19] wrongful termination, and wrongful discharge fall under the tort of wrongful discharge in violation of public policy. Claimants must demonstrate the existence of a clearly mandated public policy as part of establishing a wrongful discharge claim. Hubbard v. Spokane County, 146 Wash.2d 699, 707, 50 P.3d 602 (2002). Article I, section 11 of the Washington Constitution embodies this state's public policy of absolutely protecting "freedom of conscience in all matters of religious sentiment, belief and worship." The Church asserts that it fired Erdman for scripture violations. Thus, the trial court properly dismissed Erdman's common law employment claims based on reporting Toone's harassment.

Conclusion
¶ 58 We affirm the trial court's discovery rulings. We further affirm the trial court's *311 order granting summary judgment and dismissing Erdman's common law claims against the Church for negligent infliction of emotional distress, wrongful discharge, retaliation, and wrongful termination in violation of public policy.
¶ 59 We also affirm the trial court's order granting summary judgment and dismissing Erdman's WLAD claims for harassment and wrongful discharge.
¶ 60 We reverse the trial court's grant of summary judgment on her negligent infliction of emotional distress claim against Toone.
¶ 61 We hold that the ecclesiastical abstention doctrine does not bar Erdman's remaining claims. Thus, we reverse the trial court's order granting summary judgment on that basis.
¶ 62 We further hold that the First Amendment does not bar her negligent supervision and retention and Title VII claims against the Church and, therefore, we reverse the trial court's order granting summary judgment on that basis.
¶ 63 Affirmed in part, reversed in part, and remanded for further proceedings.[20]
We concur: ARMSTRONG, J., and PENOYAR, C.J.
NOTES
[1] Judge Houghton is serving as judge pro tempore of the Court of Appeals, Division II under RCW 2.06.150.
[2] According to the Church's human resources director, since 1996, 15 other female church employees had made complaints about Toone's behavior. She did not recall the specific details of those complaints because most of the women said they felt too threatened by Toone to file them in written form.
[3] The Church's employee handbook specifically prohibits sexual harassment. Additionally, the Church's Book of Order (2007-2009) states that its Session possesses responsibility "to provide for the administration of the program of the church, including ... fair employment practices." CP at 831.
[4] Although Erdman sued Mark and Jane Doe Toone, for clarity we refer to Mark Toone's actions in this opinion.
[5] The Presbytery made a special appearance below for purposes of objecting to a subpoena Erdman sought to enforce against it. It was not a party below. It has submitted an amicus curiae brief on appeal.
[6] The record before us does not disclose what the trial court reviewed. The better practice for trial counsel would have been to move to seal the documents the trial court reviewed in camera, thus allowing for consideration on appeal.
[7] The ministerial exception, precluding civil court review, derives from the Free Exercise and Establishment Clauses of the First Amendment. It serves to protect the relationship between religious organizations and their ministers from unconstitutional government interference. Bollard v. Cal. Province of the Soc'y of Jesus, 196 F.3d 940, 945 (9th Cir.1999). But the exception does not apply to employees of a religious institution if they are not serving in a ministerial capacity. Bollard, 196 F.3d at 947. In Alcazar v. Corp. of the Catholic Archbishop, 598 F.3d 668, 676 (9th Cir.2010), the Ninth Circuit sets forth a three-part test for determining whether the exception applies.
[8] Neither the record before the trial court nor before us adequately demonstrates that Erdman's claims would fail under the ministerial exception. Therefore, on remand, the trial court may consider this exception as further fleshed out by the parties.
[9] The ecclesiastical abstention doctrine applies and bars civil court jurisdiction where the character of the dispute's subject matter is purely ecclesiastical. Watson v. Jones, 80 U.S. (13 Wall.) 679, 733, 20 L.Ed. 666 (1871).
[10] Division One recently addressed the ecclesiastical abstention doctrine again in Rentz v. Werner, No. 62848-8-I, 2010 WL 2252529 (Wash.Ct.App. June 7, 2010). This case does not affect our analysis.
[11] We recognize Toone and the Church may have possible defenses under the Free Exercise and Establishment Clauses.
[12] As we already described, Erdman also voluntarily dismissed her negligent infliction of emotional distress claims based on facts not raised in her Form No. 26 grievance.
[13] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I, cl. 1.
[14] As the Ninth Circuit observed, "The Free Exercise Clause rationale for protecting a church's personnel decisions concerning its ministers is the necessity of allowing the church to choose its representatives using whatever criteria it deems relevant. Bollard, 196 F.3d at 947. Because no protected-choice rationale was present under the circumstances, allowing the plaintiff's claims to proceed did not intrude on church autonomy any more than "allowing parishioners' civil suits against a church for the negligent supervision of ministers who have subjected them to inappropriate sexual behavior." Bollard, 196 F.3d at 947-48.
[15] In Bollard, the Ninth Circuit also noted that, because the plaintiff sought damages as his sole remedy, there was no danger of a remedy requiring continuing court action that would result in excessive entanglement with religion. 196 F.3d at 950. Here, Erdman also sought injunctive relief based only on the Church's discriminatory employment practices. We caution the trial court that should any of Erdman's claims prevail on remand, such injunctive relief would likely violate the Establishment Clause.
[16] In its amicus brief, the Presbytery cites Germain v. Pullman Baptist Church, 96 Wash.App. 826, 980 P.2d 809 (1999), contending that a secular court's review of these claims would result in impermissible government entanglement with religion in violation of the Establishment Clause. Amicus Br. at 9. In Germain, Division Three, specifically noting that it was not deciding "whether the First Amendment forecloses all negligent supervision claims against churches based on the conduct of their ministers," held that "[t]he determination of whether to impose liability on a church where [the entire congregation held authority to terminate its pastor] would require the court to consider and interpret the church's laws and constitution," thus violating the First Amendment. Germain, 96 Wash.App. at 836, 837, 980 P.2d 809. Even assuming we agreed with the reasoning in Germain, the record in this case does not indicate that the church's congregation possesses such diffuse authority to terminate the pastor. Therefore, here Germain does not apply.

The Presbytery also contends that review of Erdman's claims would violate the greater protection afforded religious beliefs and practices under article I, section 11 of the Washington state constitution. But our Supreme Court has noted in the context of an article I, section 11 case that if a party does not provide constitutional analysis under State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986), then appellate courts will not analyze separate state constitutional grounds in a case. Open Door Baptist Church v. Clark County, 140 Wash.2d 143, 151, 995 P.2d 33 (2000). It further stated that a Gunwall analysis is still required, even when on-point case law exists where the legal principles are not firmly established. Open Door Baptist Church, 140 Wash.2d at 151 n. 6, 995 P.2d 33. Here, the Presbytery did not conduct an article I, section 11 analysis and this case presents unsettled legal principles. Therefore, we do not further discuss its article I, section 11 argument.
[17] RCW 49.60.180 provides:

It is an unfair practice for any employer:
....
(3) To discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, sexual orientation, race, creed, color, national origin, honorably discharged veteran or military status, or the presence of any sensory, mental, or physical disability or the use of a trained dog guide or service animal by a person with a disability
RCW 49.60.180 was amended in 2006 and 2007. For purposes of this opinion, those changes do not affect our analysis.
RCW 49.60.210(1) prohibits employers from discharging employees who oppose practices prohibited by chapter 49.60 RCW.
[18] See footnote 14.
[19] Erdman argues that the Church retaliated against her by discharging her for "whistleblowing" regarding the possible negative tax consequences for Toone's tours. She fails to meet the standard that requires her to identify the specific public policy. Hubbard v. Spokane County, 146 Wash.2d 699, 707, 50 P.3d 602 (2002) (claimant must demonstrate the existence of a clearly mandated public policy).

Erdman also appears to have pleaded a claim for common law retaliation in violation of public policy. Because we have considered this tort as a single, common law tort of "retaliation and wrongful discharge in violation of public policy," we do not analyze it separately. See Jenkins v. Palmer, 116 Wash.App. 671, 677, 66 P.3d 1119 (2003).
[20] As we noted, Erdman did not appeal the trial court's dismissal of her intentional infliction of emotional distress claim and she voluntarily dismissed the portions of her retaliation, negligent infliction of emotional distress, and willful withholding of wages claims that were not based on facts raised in her Form No. 26 grievance.