[No. 84998-6.  En Banc.]
Argued May 24, 2011.     Decided October 4, 2012.

ANGELA ERDMAN, *Respondent*, v. CHAPEL HILL PRESBYTERIAN
CHURCH ET AL., *Petitioners*.

*William A. Coats* and *Daniel C. Montopoli* (of *Vandeberg Johnson & Gandara LLP*), for petitioners.

*Robin W. Phillips* and *Sean V. Small* (of *Lasher Holzapfel Sperry & Ebberson PLLC*), for respondent.

*Bradley A. Maxa* on behalf of Presbytery of Olympia, amicus curiae.

¶1 MADSEN, C.J. — An employee of a church who maintains she was harmed by actions of a church's minister brought numerous claims against the church and the minister. At this stage of the proceedings, the case involves her negligent retention, negligent supervision, and Title VII sex discrimination claims against the church. The Court of Appeals, reversing the trial court's grant of partial summary judgment, ruled that these claims are not barred by the First Amendment to the United States Constitution as the trial court had determined.

■ ¶2 We reverse the Court of Appeals and reinstate the trial court's grant of summary judgment on the negligent retention and supervision claims. Under the First Amendment, allowing these claims to go forward would violate the First Amendment right of the church to select and supervise its ministers as well as the First Amendment right of a hierarchical religious organization to be free of government involvement in the decisions made by its ecclesiastical tribunals. We remand the Title VII claims for further proceedings.

## FACTS

¶3 Plaintiff Angela Erdman was an elder of Chapel Hill Presbyterian Church (Chapel Hill or Church). She became Chapel Hill's executive for stewardship, facilitating the development of vision, goals, and strategies for Chapel Hill; providing strategic leadership, helping to make decisions regarding the financial and development strategies and goals of Chapel Hill; and creating a major donor development plan for Chapel Hill. She reported to the church's senior pastor, Dr. Mark Toone, who was responsible for evaluating Ms. Erdman's work. Ms. Erdman took ordination vows agreeing to be bound by the disciplinary procedures of Chapel Hill and to seek reconciliation and resolve disputes according to church procedure.

¶4 Dr. Toone taught classes for church members on several topics and led tours of religious and historical significance to supplement the subjects he taught. Toone used personal vacation time when he led the tours. In June 2007, Ms. Erdman questioned whether the tours would adversely affect Chapel Hill's tax exempt status. Dr. Toone advised her not to pursue the matter until he returned from sabbatical later that summer, but she disregarded the advice and removed a tour announcement from a church bulletin after Toone had approved it. Ms. Erdman also discussed the tours with the church's accountant.

¶5 When Dr. Toone returned, Ms. Erdman raised the matter again, telling him about the church accountant's concerns and possible accounting issues. Toone assured her that the tours were consistent with the church's mission and were comparable to tours conducted by other churches. He told Erdman that they did not put Chapel Hill at risk but said he would discuss the matter with his accountant and review information that Ms. Erdman presented. In the meantime, he told her, he would not alter the way the tours were managed and the matter was out of her hands.[1]

¶6 According to the defendants, Toone's accountant agreed with Toone that the tours did not threaten the church's tax exempt status. Dr. Toone sent Ms. Erdman a message stating that he was satisfied the tours were properly conducted and that he wanted the matter closed. Ms. Erdman responded by asking to discuss the matter and seeking information as to how the decision had been made.

¶7 On October 17, 2007, Toone met with Erdman and told her the tours were proper and did not jeopardize the church's tax exempt status. Toone again told Erdman that she need not concern herself about the tours. He also said that her continued challenges on the subject were insubordination and that she had unfairly impugned his reputation. Ms. Erdman, in turn, accused Toone of intimidation. She threatened to quit rather than abide by his directions.[2]

¶8 Toone suspended promotional activity for the next tour and agreed to turn the matter over to the Session, which is the governing body of Chapel Hill. He appointed a committee of Session members to review the tours and the conflict with Ms. Erdman. This appointment accorded with

[1] Ms. Erdman believed the tours might involve an improper use of church property. She also maintains that Dr. Toone profited from the tours by receiving "kick backs" from the tour company. The defendants maintain that the tour company compensates Dr. Toone, who reports the income on his personal income tax return. The defendants presented evidence that the church had always considered the tours to be part of the church's ministry.

[2] According to Ms. Erdman, when he came into her office for this meeting Toone slammed her door, leaned over her desk, and screamed at her for 25 minutes.

Session Committee Principles and the Presbyterian Church (U.S.A.)'s Book of Order, which outlines the form of church government, the church's philosophy, and member and officer discipline and conflict resolution processes. Dr. Toone agreed to accept the decisions of the Session Committee. On October 18, 2007, the Session Committee met with Ms. Erdman to address the interpersonal issues between her and Dr. Toone. The committee also sought the opinions of experts as it began to evaluate the educational tours. The Session Committee's efforts to mediate the dispute did not go well. According to Chapel Hill, animosity that Erdman expressed toward Toone made it difficult for the two to work together.

¶9 In the meantime, Erdman went on sick leave from October 17 until October 22, when she requested medical leave due to stress. Toone granted her request and she formally took medical leave. According to the defendants, in November 2007, Ms. Erdman's attorney contacted a committee member and threatened to damage the church by publicizing Ms. Erdman's allegations unless a severance package was provided. Subsequently, Ms. Erdman's attorney sought a full year of severance pay for her, saying that unless this occurred, Ms. Erdman would return to work on December 3, 2007. On November 30, 2007, Erdman contacted Chapel Hill, advising that her physician had cleared her to return to work. The church placed Ms. Erdman on administrative leave without pay, pending resolution of the church's investigation.

¶10 While the Session Committee was still investigating, Ms. Erdman filed a grievance with the Presbytery of Olympia, the church's governing body for the region that includes Chapel Hill. She filed her complaint in accord with the Book of Order. The grievance concerned the tour issue and allegations that Toone intimidated her, verbally abused her, and threatened her in connection with her employment. Ms. Erdman alleged numerous violations of the Book of Order and scripture.

¶11 On December 27, 2007, the Session Committee issued its report, recommending that Erdman be immediately terminated. According to Ms. Erdman, Toone made the decision to fire her and made this recommendation to the Session Committee.

¶12 The committee concluded that Ms. Erdman had "failed to follow the scriptural teaching concerning our relationships within the body of Christ," Clerk's Papers (CP) at 1015, and violated her ordination vows. It determined that Ms. Erdman had included inaccurate allegations in her December grievance that violated the Book of Order, and that her communications included false and misleading statements about the tours and Dr. Toone's conduct. Among other things, the committee believed that Erdman had misrepresented the facts underlying the tours to the church's accountant as not being part of the church's ministry. The committee concluded that there was no evidence that Toone had unlawfully harassed Erdman as she claimed. The committee also found that Erdman had threatened to dishonor the church in an attempt to receive a severance package.

¶13 Early in January 2008, Ms. Erdman resubmitted her complaint with the Presbytery of Olympia using a proper Form No. 26, again in conformance with the Book of Order. In the Form No. 26 grievance, Ms. Erdman accused Dr. Toone of violating scripture and church law, misusing church property for personal gain, physically intimidating her, verbally abusing and harassing her, and retaliating against her. She alleged that significant portions of the Session Committee's report were "inaccurate and reflect bearing of false witness and distortion of truth." CP at 845.

¶14 In response to the grievance, over a period of months a Presbytery Investigative Committee examined the allegations. It conducted interviews with witnesses and evaluated numerous records and documents. On May 27, 2008, it concluded that Ms. Erdman's allegations could not be reasonably proved and declined to file charges against

Toone. Under the Book of Order, Ms. Erdman had the right to appeal this decision, but did not.

¶15 On June 12, 2008, Ms. Erdman filed suit against Chapel Hill and Dr. Toone, asserting numerous claims, including claims of negligent retention of Toone, negligent supervision of Toone, and Title VII claims of violation of 42 U.S.C. § 2000e-2. After hearing argument, the trial court determined that it lacked sufficient facts to decide whether Ms. Erdman was herself a minister subject to the "ministerial exception" to a Title VII suit and declined to rule in the defendants' favor on this claim. The court dismissed all claims based on facts set forth in the Form No. 26 grievance to the Presbytery of Olympia on the ground that under the First Amendment a civil court cannot consider claims submitted to a hierarchically organized church's ecclesiastical tribunal. These included the negligent retention and negligent supervision claims. Erdman voluntarily dismissed other claims and then appealed.

¶16 The Court of Appeals affirmed the trial court's dismissal of several of Ms. Erdman's claims but, among other things, reversed the trial court's dismissal of her negligent supervision, negligent retention, and Title VII claims against Chapel Hill. *Erdman v. Chapel Hill Presbyterian Church*, 156 Wn. App. 827, 234 P.3d 299 (2010). Chapel Hill and Dr. Toone (together Chapel Hill, unless otherwise specified) then sought discretionary review.

## ANALYSIS

### Title VII claims

¶17 At the outset, we decline to address Ms. Erdman's Title VII claims, to which Chapel Hill claims the "ministerial exception" applies.[3] The parties dispute whether Ms. Erdman was a minister of the Church and therefore subject

---

[3] Ms. Erdman brought several Title VII claims based on sex and religious discrimination. The sex discrimination claims are at issue here.

to the constitutionally based ministerial exception to a Title VII claim. As the trial court determined when ruling on the Church's summary judgment motion, the record is not developed sufficiently to make the determination. We accordingly remand this claim for further proceedings. The United States Supreme Court's recent decision in *Hosanna-Tabor Evangelical Lutheran Church & School v. Equal Employment Opportunity Commission*, ___U.S. ___, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012), concerning a claim brought under the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. §§ 12101-12213, addresses the ministerial exception grounded in the First Amendment and provides guidance as to who qualifies as a minister under the exception. As the Court explains, this exception has been recognized by the Courts of Appeal in Title VII actions. *Hosanna-Tabor*, 132 S. Ct. at 705.[4]

### Negligent retention and supervision claims

¶18 We are left with Chapel Hill's contentions that as a matter of law permitting the negligent retention and negligent supervision claims to go forward violates its First Amendment right to select and supervise its ministers and its First Amendment right, as part of a hierarchical religious organization, to deference to decisions made by its ecclesiastical tribunals. We agree.

¶19 The Court of Appeals reversed summary judgment on Ms. Erdman's negligent retention and supervision claims. Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). A grant

---

[4] Among other things, in describing the circumstances that led to the Court's conclusion that the ministerial exception applied to the teacher in the case the Court cautioned that the performance of secular duties does not disqualify an individual from being a minister. *Hosanna-Tabor*, 132 S. Ct. at 709. The Court observed that "[t]he heads of congregations themselves often have a mix of duties, including secular ones such as helping to manage the congregation's finances, supervising purely secular personnel, and overseeing the upkeep of facilities." *Id.*

of summary judgment is reviewed de novo and all of the facts and inferences are considered in the light most favorable to the nonmoving party. *Bank of Am., NA v. Owens*, 173 Wn.2d 40, 48-49, 266 P.3d 211 (2011).

¶20 The First Amendment to the United States Constitution is applicable to the states through the Fourteenth Amendment and guarantees the right to free exercise of one's chosen religion and forbids government establishment of religion. It states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. amend. I. The Constitution mandates that religious organizations must retain the " 'power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.' " *Hosanna-Tabor*, 132 S. Ct. at 704 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952) (holding invalid New York legislation intended to transfer control of Russian Orthodox Churches in New York from Moscow to church authority in the United States)). The First Amendment protection of religious freedom requires that courts remain neutral in matters concerning religious doctrine, beliefs, organization, and administration.

¶21 Both the supervision and retention claims implicate important First Amendment concerns. First, a religious organization must be able to choose and retain its spiritual leaders.[5] Second, the church at issue is part of a hierarchical religious organization and its highest ecclesiastical tribunal's decisions on issues of discipline, faith, and ecclesiastical law must be given deference by a civil court.

---

[5] The concurrence-dissent objects to our consideration of this issue of the case. It was raised in the petition for review, involves an important constitutional aspect of this case, and adds to the full understanding of why summary judgment on the negligent retention and supervision claims was properly granted.

### Chapel Hill's right to oversee, discipline, and retain its spiritual leaders

¶22 As Chapel Hill contends, a secular court generally cannot question personnel decisions concerning a church's minister. A religious organization's choice of person to serve as its minister is "one of the most fundamental rights belonging to a religious institution. It is one of the most important exercises of a church's freedom from government control." *Ayon v. Gourley*, 47 F. Supp. 2d 1246, 1250 (D. Colo. 1998), *aff'd on other grounds*, 185 F.3d 873 (10th Cir. 1999).

¶23 The right has long been recognized by the United States Supreme Court. In 1929, the Court was faced with a dispute arising from a will, which turned on the question whether a particular person would be appointed to a chaplaincy in the Roman Catholic Church. *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16, 50 S. Ct. 5, 74 L. Ed. 131 (1929). The Court stated, "Because the appointment [to the chaplaincy] is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them." *Id*. Subsequently, the Court affirmed that "[f]reedom to select the clergy . . . must now be said to have federal constitutional protection as part of the free exercise of religion against state interference."[6] *Kedroff*, 344 U.S. at 116; *see Hosanna-Tabor*, 132 S. Ct. at 704. The First Amendment "gives special solicitude to the

---

[6] Omitted from this quotation is the now discredited idea that constitutional protection would apply only insofar as no improper methods of choice, specifically fraud, collusion, and arbitrariness, were proved. The Court has repudiated the idea that anything other than fraud or collusion might suffice to avoid the strictures of the First Amendment, and has left open but questioned whether inquiry could be made even in the matter of fraud and collusion when church officials act in bad faith for secular purposes. *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 712-13, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976). The Court observed that the concept of such " 'marginal civil court review' " was dictum in *Gonzalez*, the first case referring to it, and pointed out that no decision of the Court had ever given it effect. *Id*. at 712 (quoting *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969)).

rights of religious organizations." *Hosanna-Tabor*, 132 S. Ct. at 706.

¶24 The religious freedoms embodied in the First Amendment are without question among the most precious rights we are privileged to enjoy. Religious persecution had a great deal to do with the founding of our nation, as our forebears battled against it and sought to ensure that future generations would not be oppressed because of religion, prevented from its free exercise, or subjected to a state-imposed set of beliefs. These are not merely rights that a state and its courts may choose to recognize, but rather rights that courts must recognize in full.

¶25 There are, generally speaking, some types of tort actions that may be brought against a church, and sometimes even for acts of its clergy. For example, the Missouri Supreme Court noted, a church may be subjected to premises liability or can be vicariously liable for its pastor's negligent operation of a vehicle while in the scope of employment. *Gibson v. Brewer*, 952 S.W.2d 239, 246 (Mo. 1997).

¶26 But claims of negligent retention and supervision pose serious First Amendment concerns that often weigh against allowing a tort claim to proceed in a civil court. As the Court's analyses in *Kedroff* and *Hosanna-Tabor* indicate, negligent retention and supervision claims implicate a religious organization's First Amendment right to select its clergy. "Questions of hiring, ordaining, and retaining clergy . . . necessarily involve interpretation of religious doctrine, policy, and administration." *Gibson*, 952 S.W.2d at 246-47. A minister's employment "concerns internal church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law." *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986). Religious organizations " 'each have their own intricate principles of governance, as to which the state has no rights of visitation,' " and it would therefore be improper for a civil court " 'to determine after the fact that the ecclesiastical authori-

ties negligently supervised or retained'" a minister. *Swanson v. Roman Catholic Bishop of Portland*, 1997 ME 63, 692 A.2d 441, 445 (quoting *Schmidt v. Bishop*, 779 F. Supp. 321, 332 (S.D.N.Y. 1991)). "Pastoral supervision is an ecclesiastical prerogative." *Id.*[7]

¶27 In *Hosanna-Tabor*, the Court recently confirmed that "the authority *to select* and *control* who will minister to the faithful . . . is the church's alone." *Hosanna-Tabor*, 132 S. Ct. at 709 (emphasis added).[8] A civil court's involvement in these matters generally constitutes "excessive entanglement between church and state [and] has the effect of inhibiting religion, in violation of the First Amendment." *Gibson*, 952 S.W.2d at 246-47. Imposing civil liability on a church based on its retention or supervision of its clergy can influence a religious organization's decisions about who are to act as its ministers, impermissibly involving the state in religious matters. The establishment and free exercise clauses may be chilled by an award of damages based on a church's retention or supervision of its minister, " 'leading indirectly to state control over the future conduct of affairs of a religious organization.' " *Swanson*, 692 A.2d at 445 (quoting *Schmidt*, 779 F. Supp. at 332).

Negligent retention claims

¶28 Turning now specifically to a negligent retention claim, both the establishment and free exercise clauses are

---

[7] The concurrence-dissent objects to reliance on cases that involve sexual abuse. The fact is, though, that many of the cases addressing the important issues here involve sexual abuse. We consider them for their legal principles. We are not faced here with allegations of sexual abuse and certainly not sexual abuse of children. It is important to bear in mind that we are applying general principles and do not decide any issues involving criminal acts.

[8] The concurrence-dissent maintains that *Hosanna-Tabor* is much narrower than we give it credit for. But the decision in *Hosanna-Tabor* rests on important First Amendment concepts that are not applicable only to the context of that case. In fact, the Court clarified a number of important First Amendment principles that are applicable in the present case. We recognize the legal issues actually decided are not those that are involved here, but the Court's decision contains relevant analysis that is important to our resolution of the present case.

implicated in decisions about who will serve as a minister, and thus about retention of a minister. The establishment clause prohibits "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Comm'n*, 397 U.S. 664, 668, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970); *see Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 615, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971) (the *Lemon* test requires consideration of "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority"). The purpose of the free exercise clause is "to secure religious liberty . . . by prohibiting any invasions thereof by civil authority." *Sch. Dist. v. Schempp*, 374 U.S. 203, 223, 83 S. Ct. 1560, 10 L. Ed. 2d 844 (1963). "The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice." *Hernandez v. Comm'r*, 490 U.S. 680, 699, 109 S. Ct. 2136, 104 L. Ed. 2d 766 (1989).

¶29 When a state imposes an unwanted minister on a religious group, it "infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments." *Hosanna-Tabor*, 132 S. Ct. at 706. The court in *Ayon*, 47 F. Supp. 2d at 1250, explained that to insert itself into a church's hiring decision "would substantially burden these Defendants' free exercise of a crucial power to control the future of the church and therefore constitute interference with the practice of their religion." Moreover, the establishment clause is also violated when a state is accorded "the power to determine which individuals will minister to the faithful." *Hosanna-Tabor*, 132 S. Ct. at 706. It would also "cause excessive entanglement in church operations by fostering inappropriate government involvement. The application of even general tort law principles to church procedures on the choice of priests would require an inquiry into present practices with an intent to pass on their reasonableness." *Ayon*, 47 F. Supp. 2d at 1250.

¶30 The Constitution prevents courts from deciding what makes an individual competent to serve as a minister because it would require a court to interpret church canons and internal church practices and policies. *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 307, 533 N.W.2d 780 (1995); *id.* at 330 ("the tort of negligent hiring and retention may not be maintained against a religious governing body due to concerns of excessive entanglement"). Judicial inquiry into hiring, ordaining, and retaining clergy would result in an endorsement of religion, by approving one model for church hiring, ordination, and retention of clergy. *Gibson*, 952 S.W.2d at 247; *cf. Amato v. Greenquist*, 287 Ill. App. 3d 921, 679 N.E.2d 446, 450, 223 Ill. Dec. 261 (1997) (permitting a claim for clergy malpractice would require establishment of a reasonable standard of care for individuals practicing their faiths, necessarily requiring interpretation of doctrine).

## Negligent supervision claims

¶31 Permitting civil court inquiry into claims of negligent supervision can also result in violations of both the establishment and free exercise clauses of the First Amendment. "Adjudicating the reasonableness of a church's supervision of a cleric . . . requires inquiry into religious doctrine," which would "create an excessive entanglement, inhibit religion, and result in endorsement of one model of supervision." *Gibson*, 952 S.W.2d at 247.

¶32 In *Schmidt*, the court explained that instructing a jury as to a duty of care that a member of the clergy should exercise would necessarily require a court or jury to define the standard to be followed by other members of the clergy in the particular religious organization. *Schmidt*, 779 F. Supp. at 328. In turn, this would mean that the court and jury would have "to consider the fundamental perspective and approach . . . inherent in the beliefs and practices of that denomination. This is as unconstitutional as it is

impossible. It fosters excessive entanglement with religion." *Id.*; *see also Ehrens v. Lutheran Church-Mo. Synod*, 269 F. Supp. 2d 328 (S.D.N.Y. 2003).

¶33 In *L.L.N. v. Clauder*, 209 Wis. 2d 674, 563 N.W.2d 434 (1997), the Wisconsin Supreme Court drew from James T. O'Reilly & JoAnn M. Strasser, *Clergy Sexual Misconduct: Confronting the Difficult Constitutional and Institutional Liability Issues*, 7 ST. THOMAS L. REV. 31 (1994), to show how a court's determination of "duty" and "reasonableness" as required for negligence would inevitably entangle the court in religious discipline practices. O'Reilly and Strasser provide as an example the Roman Catholic Church's disciplinary procedures:

> "The reconciliation and counseling of the errant clergy person involves more than a civil employer's file reprimand or three day suspension without pay for misconduct. Mercy and forgiveness of sin may be concepts familiar to bankers but they have no place in the discipline of bank tellers. For clergy, they are interwoven in the institution's norms and practices."

*L.L.N.*, 209 Wis. 2d at 689-90 (quoting O'Reilly & Strasser, *supra*, at 45-46). Determining whether a church has appropriately supervised a clergy person thus involves state entanglement in religious doctrines. The Wisconsin court explained:

> [D]ue to th[e] strong belief in redemption, a bishop may determine that a wayward priest can be sufficiently reprimanded through counseling and prayer. If a court was asked to review such conduct to determine whether the bishop should have taken some other action, the court would directly entangle itself in the religious doctrines of faith, responsibility, and obedience.

*Id.* at 690 (citing O'Reilly & Strasser, *supra*, at 31, 43-46).

¶34 In *Pritzlaff*, 194 Wis. 2d 302, the plaintiff alleged, among other things, that an archdiocese was negligent in supervising a priest who allegedly used his position as a priest to develop a friendship with the plaintiff and then to

coerce her into a sexual relationship with him. She maintained that the archdiocese knew or should have known of the conduct and taken steps to stop it. The court acknowledged that in some limited instances training and supervision might be examined without determining questions of church law and politics but concluded as a general rule that a state inquiry into training and supervision of clergy is prohibited by the First Amendment in most circumstances. *Id*. at 328.

¶35 The court rejected the plaintiff's claims, noting that courts have expressed concern over the different principles of governance, which, in the Christian church at hand, was to be found in scripture and modified over almost two thousand years. *Id*. at 329. Such individual principles of governance as exist in each religion pose problems of government entanglement in making judgments about supervision in light of the religious organization's beliefs. *Id*. The court in *Pritzlaff* was also concerned about the chilling effect on religions and exercise of religious beliefs if subject to court judgments about the propriety of churches' supervision of its ministers. *Id*. The court concluded that "the tort of negligent training or supervision cannot be successfully asserted . . . because it would require an inquiry into church laws, practices and policies." *Id*. at 331.

¶36 As courts have recognized, negligent supervision claims should not be permitted to go forward because it is virtually impossible to adjudicate such claims without inquiring into existing church doctrines and beliefs in order to establish duty, the standard of care, and what constitutes violation of the standard, or, just as problematic, forcing state-established standards onto a religious organization after the fact without regard to the organization's religious doctrines, beliefs, and customs.

### Ms. Erdman's claims; Court of Appeals' decision

¶37 Here, Ms. Erdman claims that Chapel Hill negligently retained Toone as its minister and negligently su-

pervised him. The Court of Appeals held that Ms. Erdman was entitled to pursue these claims because they involve prima facie elements of civil tort law, not ecclesiastical law.

¶38 However, the Court of Appeals applied what has been called the "neutral principles of law" theory, which provides that courts are not bound to accept the decisions of ecclesiastical tribunals as to matters that fall outside the parameters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. *Erdman*, 156 Wn. App. at 841.

¶39 This approach has been applied to property disputes over church property and was addressed in *Jones v. Wolf*, 443 U.S. 595, 604, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979). Under the approach, civil courts may resolve disputes over church property where, without any inquiry into religious doctrine, the disputes can be resolved through language in deeds, terms of church charters, state statutes governing the holding of church property, and the provisions in a particular church constitution concerning ownership and control of church property. The chief advantages of the neutral-principles approach, the Court observed, include that "it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to judges and lawyers." *Id*. at 603. The Court thought it "promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id*.

¶40 The Court of Appeals said that while courts "abstain from asserting jurisdiction over civil claims dependent solely on interpretation of religious scripture or doctrine . . . this abstention does not . . . apply in all circumstances." *Erdman*, 156 Wn. App. at 842. The court concluded that Ms. Erdman's claims involve "prima facie elements of civil tort law, not ecclesiastical law" and therefore were subject to adjudication in a civil court. *Id*. The court added that Toone

and Chapel Hill may have possible defenses under the religion clauses.

¶41 Contrary to the Court of Appeals belief, the neutral principles of law approach is not a proper approach for the claims before us. In *Hosanna-Tabor,* a teacher at a church school was also regarded by the church, Hosanna-Tabor Evangelical Lutheran Church, as a Lutheran commissioned minister based upon having been called to her vocation by God and having completed a course of theological study. She developed narcolepsy and eventually was terminated. She filed a charge with the Equal Employment Opportunity Commission (EEOC), claiming her employment had been terminated in violation of the Americans with Disability Act (ADA). The EEOC brought suit against Hosanna-Tabor, alleging that the teacher had been fired for threatening to bring an ADA suit. Hosanna-Tabor invoked the "ministerial exception," arguing that the suit was barred by the First Amendment because the claim concerned the employment relationship between a religious organization and one of its ministers.

¶42 The Court held that the First Amendment establishment and free exercise clauses bar suits claiming employment discrimination brought on behalf of ministers against their churches. Among other things, the EEOC and the teacher suggested that the asserted reason for firing the teacher was pretextual. The Court responded by saying that this suggestion misses the significance of the ministerial exception, which "is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that *the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." Hosanna-Tabor,* 132 S. Ct. at 709 (citation omitted).[9]

---

[9] The Court specifically rejected the argument that the neutral principles of law approach applied in *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990), saying that a church's selection of its ministers is not like ingesting peyote (the conduct

¶43 As this analysis instructs, there is no room for the "neutral principles of law" approach in the case of civil tort claims brought against a church involving its authority to hire and control its ministers. Whether the situation involves religious reasons or interpretation of religious scripture or doctrine is not determinative of the First Amendment protections to the church. The Court of Appeals erred in its conclusion that because the claims involves prima facie elements of civil law, they are not foreclosed as a matter of law. To the contrary, they are foreclosed as a matter of law. A civil court is not entitled to interfere with or intervene in a church's selection and supervision of its ministers, here Chapel Hill's retention and supervision of Toone, when civil claims of negligent retention and supervision are asserted.

---

regulated by a neutral law of general applicability in *Smith*) and "concerns government interference with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 132 S. Ct. at 706-07.

The concurrence-dissent objects to our rejection of the "neutral principles of law" approach in this case. However, taken as a whole, the Court's recognition of the relationship between a church's religious doctrine, tenets, and beliefs, and its ministers and their selection and control does not leave room for the "neutral principles of law" approach as a kind of coequal First Amendment analysis generally available where a church's relationship with its ministers is involved. The doctrine has not been applied as such by the Court, and instead it has been applied only in limited circumstances—certain property disputes involving church property and where a neutral law of general applicability regulates physical conduct. Certainly it has not been involved where a tort claim has been brought against a church for actions of its minister.

It is also significant that where church property disputes touched in any respect on religious beliefs, the Court did not apply the doctrine even in the property dispute realm. *Hosanna-Tabor*, 132 S. Ct. at 704-05 (discussing *Kedroff*, 344 U.S. at 116, and *Milivojevich*, 426 U.S. 696).

We have applied the doctrine only once, insofar as research discloses, and have never applied it beyond the property context. The concurrence-dissent's reference to *C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 985 P.2d 262 (1999) is misleading. First, the issue was not considered there. Second, in the particular case among the consolidated cases to which the concurrence-dissent refers, there was no majority. Rather, the decision that the concurrence-dissent refers to was a plurality (*Funkhouser v. Wilson*, No. 66580-0). *See C.J.C.*, 138 Wn.2d at 729-41 (Madsen, J., concurring).

### Chapel Hill's First Amendment right to select and supervise its clergy

¶44 Introducing government standards into the selection and retention of the church's spiritual leaders would " ' "significantly, and perniciously, rearrange the relationship between church and state." ' " *Elvig v. Ackles*, 123 Wn. App. 491, 497, 98 P.3d 524 (2004) (quoting *Gates v. Catholic Archdiocese of Seattle*, 103 Wn. App. 160, 166, 10 P.3d 435 (2000) (quoting *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985))). It would also interfere with the free exercise of religion because the selection and retention of a minister involve a church's religious beliefs and doctrine and directly concern the matter of who will serve as the church's spiritual leader. As the Court said in *Hosanna-Tabor*, a religious organization's selection and control of its minister is a strictly ecclesiastical matter.

¶45 Ms. Erdman's negligent supervision claim would require a civil court to examine Chapel Hill's personnel decisions about Toone's supervision. As the church explains, a Session Committee of Chapel Hill investigated Ms. Erdman's allegations and concluded that Erdman, and not Toone, had acted improperly and had violated scripture and her ordination vows. Ms. Erdman submitted a grievance to the Presbytery of Olympia, claiming that Toone had violated scripture and church law and harassed her. She maintained that the Session Committee's report was not accurate. A church Investigative Committee of the Presbytery of Olympia looked into these claims and decided that they could not be established. Its decision shows that scripture and church doctrine were considered to reach a decision.

¶46 If a civil court is permitted to inquire into Ms. Erdman's negligent supervision claim, it cannot avoid entanglement in church doctrine because it would have to

consider Chapel Hill's personnel decisions, the Session Committee's actions, and the Investigative Committee's decision. The church's actions and decisions plainly involved consideration of church beliefs and doctrine, and a civil court necessarily intrudes into the realm of these when it imposes a civil tort framework on such acts and decisions. Either the court must disregard the church's beliefs and doctrine and thereby infringe on the church's First Amendment rights to select and supervise its clergy—its free exercise of its religious beliefs and doctrine—or it must attempt to take into account the church's religious grounds for its decision, thereby entangling state and church.

¶47  These concerns, as well as others, show why a court must not inquire into a religious organization's retention and supervision of its spiritual leaders under these circumstances. Because religious organizations have the First Amendment right to select and supervise their clergy in accord with their religious beliefs and doctrines, Ms. Erdman's claims of negligent supervision and retention are not permitted.

As a member of a hierarchical religious organization, Chapel Hill is entitled to deference with respect to its decisions on the negligent retention and supervision claims

¶48  "Hierarchical churches may be defined as those organized as a body with other churches having similar faith and doctrine with a common convocation or ecclesiastical head." *Kedroff*, 344 U.S. at 110. In *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 20 L. Ed. 666 (1871), the Court explained that the rule that should "govern the civil courts" is that "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the

case before them." *See also Kedroff*, 344 U.S. at 113. *Watson* was decided before the First Amendment was incorporated under the Fourteenth Amendment and applied to the states, and its holdings thus were based on "general law." *Id.* at 115-16. However, its ruling was confirmed under a First Amendment analysis:

> [T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 724-25, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976); *see also Hosanna-Tabor*, 132 S. Ct. at 705; *Jones*, 443 U.S. at 604. And in *Kedroff*, the Court described the decision in *Watson*, saying that it "radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff*, 344 U.S. at 116.

¶49 As stated in *Watson* and subsequently repeated by the Court in a First Amendment analysis:

> The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have

them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.

*Watson*, 80 U.S. at 728-29; *see Hosanna-Tabor*, 132 S. Ct. at 704; *Milivojevich*, 426 U.S. at 710-11; *Kedroff*, 344 U.S. at 114-15. The ruling applies to "questions of discipline, or of faith, or of ecclesiastical rule, custom, or law." *Watson*, 80 U.S. at 727.

¶50 Chapel Hills is a Presbyterian church, undisputedly a hierarchically structured church. The hierarchical structure consists of governing bodies called Session, Presbytery, synod, and General Assembly. Ms. Erdman took ordination vows to be bound by the Presbytery's decisions, vowing to "be governed by [the Church's] polity" and to "abide by its discipline." CP at 810, 817 (Book of Order G-14.0207(e)). She filed a Form No. 26 grievance acknowledging that her complaint was "under the jurisdiction of the Olympia Presbytery." CP at 843. The grievance that she filed involved matters of church discipline and church law, as shown by (a) her allegations that Dr. Toone's "conduct and actions violate[d] scripture as found in" numerous specified passages from the Bible; (b) her claim that Toone's conduct was "inconsistent with the teachings found in The Book of Confessions (PCUSA)"; (c) her claim that he had "violated his ordination vows, specifically as found in The Book of Order G-14.0405b: items 4, 5, 6, 7, 8 and 9"; (d) her claim that Toone had "violated his responsibilities as outlined in The Book of Order," a church guide, with numerous provisions of the book identified; and (e) her references to numerous Chapel Hill policies. CP at 845-46.

¶51 That her allegations involve matters of Church discipline, faith, and ecclesiastical law is also demonstrated by the Session Committee's report, which detailed sections of the Book of Order that it found Ms. Erdman had violated, and its conclusion that she "failed to follow the scriptural

teaching concerning our relationships within the body of Christ as found in Matthew 5:25, Ephesians 4:3." CP at 1015.

¶52 In short, Ms. Erdman submitted her claims of negligent retention and supervision, among other claims, to the decision-making ecclesiastical tribunal of a hierarchical church, and this tribunal based its decision on church doctrine, policies, and religious beliefs. Under the principles set out in *Watson*, *Milivojevich*, and *Kedroff*, a civil court is required to defer to the church's ecclesiastical decision. Not only do the United States Supreme Court's decisions respecting the First Amendment dictate this outcome, in *Presbytery of Seattle, Inc. v. Rohrbaugh*, 79 Wn.2d 367, 485 P.2d 615 (1971), this court, too, recognized the principle that deference is to be afforded such decisions of an ecclesiastical tribunal of a hierarchical church.

¶53 Thus, the negligent retention and supervision claims are also foreclosed on the ground that Ms. Erdman's dispute has been decided by the Presbytery of Olympia, and Ms. Erdman declined to appeal from that decision.

¶54 Courts must avoid encroaching on a religious organization's First Amendment rights, and must ensure that when a cause of action is permitted it does not infringe on the rights of the religious organization to define and manage matters of religious faith, doctrine, discipline, and custom. Tort claims may be foreclosed because, in many instances, the freedom to exercise a particular faith and hold particular religious beliefs without government intrusion must prevail over individual tort claims. This is not to say that purely secular activity can never be remedied through legal action, nor is it to say that criminal behavior must be permitted. We address neither of these situations here, however.[10]

---

[10] The concurrence-dissent suggests that we have interpreted the First Amendment to condone sexual exploitation of children. It is uncertain why this statement finds its way into this case, but we certainly have not addressed any such question

## CONCLUSION

¶55 The First Amendment establishment and free exercise clauses bar Ms. Erdman's claims that Chapel Hill negligently retained and supervised Senior Pastor Toone. As recently reaffirmed by the United States Supreme Court in *Hosanna-Tabor*, the church alone has the authority to select and control who will be its ministers, as a strictly ecclesiastical matter. As a number of courts have recognized, a civil court violates both religion clauses when it allows claims of negligent retention and negligent supervision of ministers to go forward. Moreover, in this case, the challenged conduct was the subject of Ms. Erdman's grievance filed with the Presbytery of Olympia, which issued a decision that Ms. Erdman did not appeal. When a hierarchical church's highest ecclesiastical tribunal to which the matter has been submitted issues a decision on a question of discipline, faith, or ecclesiastical rule, custom, or law, a civil court must accept the decision as final and binding. Ms. Erdman's claims involved matters of discipline and faith, but as importantly, it involved the ecclesiastical matter of who would serve as the church's minister and his supervision.

¶56 As explained in this opinion, Ms. Erdman's claims, if adjudicated by a civil court, would not involve merely a limited secular inquiry without implicating religious doctrine. Adjudicating her claims would impact church governance and religious practice, and entangle government in Chapel Hill's exercise of religious faith. The church's own investigation and decision involved consideration of spiritual standards, religious doctrine, and the church's policies and practices.

¶57 We reverse the Court of Appeals decision reversing the negligent retention and negligent supervision claims.

---

in this case. Concurrence-dissent at 685. The concurrence-dissent also equates tort and criminal law—an equation that is not justified by our law. *Id.*

We remand the Title VII claims for further consideration in light of *Hosanna-Tabor*. We do not limit the parties' arguments respecting that decision on the issue of whether Ms. Erdman was a minister for purposes of the ministerial exception or any other questions in relation to her Title VII sex discrimination claims.

¶58 The Court of Appeals is reversed and the trial court's summary judgment of dismissal of the negligent retention and supervision claims is reinstated.

OWENS, J.M. JOHNSON, and WIGGINS, JJ., concur.

¶59 ALEXANDER, J.* (concurring in result reached by lead opinion) — The lead opinion and concurrence/dissent each agree that because Angela Erdman submitted her claims involving matters of discipline, faith, and ecclesiastical law to the Presbytery of Olympia and did not appeal the decision of that body, we must accept that decision as final and binding. That conclusion, in my judgment, resolves the case, and we should not, as the lead opinion and concurrence/dissent do, speculate about what this court should do in factually dissimilar cases that may come before the court in the future.

FAIRHURST, J., concurs with ALEXANDER, J. PRO TEM.

¶60 CHAMBERS, J. (dissenting in part/concurring in part) — I agree with the lead opinion in result but on different grounds. Angela Erdman submitted her claims to a tribunal of a hierarchal church. She is now bound by its decision. However, I cannot agree with the lead opinion that the ministerial exception doctrine plays any role here.

¶61 Since the beginning of our republic, our courts have strived to protect both the rights of religious institutions to

---

* Justice Gerry L. Alexander is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

be free of unwarranted governmental interference and the rights of individuals to the protection of the laws. Different courts have adopted different approaches in different cases. The United States Supreme Court has never held that the First Amendment demands only one approach so long as the approach taken avoids judicial resolution of questions of faith and excessive entanglement with religion. But the First Amendment does not vest churches with immunity from criminal or tort liability. While churches have a right to be free from state interference in matters of religious doctrine or faith, no exercise of religious faith condones the sexual exploitation of children.

I

¶62 Taking her allegations as true, as we must at this point, Erdman, in her capacity as the Chapel Hill Presbyterian Church's chief financial officer, questioned whether Pastor Mark J. Toone was entitled to be reimbursed out of church funds for a complementary plane ticket to Ireland. Ultimately, this question led to her being fired. Pastor Toone had accepted the ticket from a tour company he worked with guiding tours of religiously significant sites around the world. He was compensated by that tour company for his time. As she investigated, Erdman became concerned that Pastor Toone was jeopardizing the church's tax exempt status by using church resources to advertise this paid outside work. She brought her concerns to Pastor Toone who instructed her not to investigate any further and to turn her files over to him. When she would not drop the matter, Pastor Toone came into her office, "angrily told me that I was insubordinate," yelled, shook his finger in her face, was physically intimidating, "got extremely cruel and nasty," told her his tours were none of her business, and ended the conversation by storming out of her office and slamming the door. Clerk's Papers (CP) at 322-23. He left her shaken and in tears.

¶63 Pastor Toone appointed a small "session committee" of Chapel Hill church members to investigate the conflict between him and Erdman. That session committee recommended Pastor Toone fire Erdman, which he did promptly. Meanwhile, Erdman filed a complaint against Pastor Toone with the regional organization of their church. Among other things, she charged that Pastor Toone had sought reimbursement for expenses he had not incurred, harassed and retaliated against her when she questioned him, and violated a large number of enumerated scriptures and church doctrines. In response, the Presbytery of Olympia convened an "investigatory committee," which concluded Erdman's charges of "misuse of church possessions, negligence, and abuse of responsibilities of a minister [including] theft and bearing false witness . . . could not be reasonably proved," effectively rejecting her complaint. CP at 137, 848. This suit followed.

## II

¶64 The lead opinion states that "a civil court violates both religion clauses when it allows claims of negligent retention and negligent supervision of ministers to go forward." Lead opinion at 683. This statement is breathtaking: it implies that *no* claim of negligent retention or supervision, no matter how appalling the conduct, could ever go forward against a church based on the misconduct of its clergy. The case the lead opinion relies upon the most, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. Equal Emp't Opportunity Comm'n*, ___ U.S. ___, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012), neither considers that proposition nor supports that conclusion. The United States Supreme Court's flat rejection of the suggestion that courts lack jurisdiction to consider claims against churches suggests to me that the Court, had it considered that proposition, would have rejected it. *Id.* at 709 n.4.

## A. Ministerial Exception Doctrine

¶65 It troubles me that we are considering this issue at all. The church did *not* argue below that due to Pastor Toone's status as a minister, Erdman's claims should be dismissed. Instead, the church argued that *Erdman* was a minister and that because of *her* status, the ministerial exception doctrine barred her claims. The church may be correct. But then-Pierce County Superior Court Judge Worswick denied the church's motion for summary judgment on this issue merely because she did not "have enough facts to determine that [Erdman] is a minister." Verbatim Transcript of Proceedings at 24. The church renewed its argument that Erdman's status as a minister barred the claim on appeal, contending that "[b]ecause the Executive for Stewardship position served the Church's spiritual and pastoral mission, the ministerial exception applies to *Ms. Erdman's* job [and] secular courts lack subject matter jurisdiction over *Ms. Erdman's* claims." Br. of Resp'ts at 38 (emphasis added).[11] The Court of Appeals, properly, affirmed Judge Worswick's conclusion that there was not enough evidence on the record to decide the question. *Erdman v. Chapel Hill Presbyterian Church*, 156 Wn. App. 827, 837 n.8, 234 P.3d 299 (2010). My review of the record persuades me that conclusion is correct.

¶66 Whether Pastor Toone's status as a minister would bar these claims was raised for the first time in Chapel Hill's petition for review to this court in the context of whether grounds for review under RAP 13.4(b) were present. *See* Pet. for Review at 13-14. While we certainly have the power to resolve issues the parties did not properly present or preserve, we generally do not, and we do not for very good reasons. *See* RAP 2.5(a). Among those reasons:

---

[11] Again, the United States Supreme Court firmly rejected the notion that the ministerial exception doctrine was a jurisdictional doctrine. *Hosanna-Tabor*, 132 S. Ct. at 709 n.4.

this court is designed to decide arguments properly presented and developed by disputing parties. In this case, neither party has. It would be wise to leave it for another day when it has been vigorously, and actually, litigated.

¶67 But given that the lead opinion has chosen to go down this path, I will follow it part way. I completely agree that courts have no business interfering with a church's choice of ministers. *Schleicher v. Salvation Army*, 518 F.3d 472, 475 (7th Cir. 2008) (citing *Petruska v. Gannon Univ.*, 462 F.3d 294, 302-08 (3d Cir. 2006)). But it is a far cry from saying that courts have no business interfering with a church's choice of ministers to holding that a church is effectively immune from the consequences of its choices. True, some courts have so held. But many of these courts based their rulings on the principle, since discredited by the United States Supreme Court, that the *court* lacked subject matter jurisdiction. *See, e.g., Fontana v. Diocese of Yakima*, 138 Wn. App. 421, 427, 157 P.3d 443 (2007) (dismissing plaintiff's constructive discharge claim for "lack of subject matter jurisdiction"); *Gates v. Catholic Archdiocese of Seattle*, 103 Wn. App. 160, 169, 10 P.3d 435 (2000) (dismissing employment contract claim for "lack of jurisdiction"). The reasoning in these cases has been rejected by *Hosanna-Tabor*, 132 S. Ct. at 709 n.4.

¶68 While the lead opinion cites many cases, it cites only five (out of only three courts) that have found that negligent supervision or negligent retention claims against churches for the conduct of ministers should be dismissed on First Amendment grounds. None of these cases mention the "ministerial exception doctrine" pleaded here and, not surprisingly given that they go to a theory the parties did not present, none of these cases are mentioned in the parties' briefing.

¶69 I can certainly see why the church did not cite these cases: in all five cases, the courts dismissed negligent supervision and retention claims against churches for clergy

sexual misconduct. Given that we have already allowed cases against churches involving clergy sexual misconduct to go forward, *see, e.g., C.J.C. v. Corp. of Catholic Bishop of Yakima*, 138 Wn.2d 699, 728, 985 P.2d 262 (1999), I can see why the church might think we would not find them persuasive. In *Pritzlaff*, the Wisconsin Supreme Court, over vigorous dissents, dismissed Pritzlaff's claims that when she was a high school student, a priest used his position as a priest and counselor to groom her for a sexually exploitive relationship. *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis. 2d 302, 307, 533 N.W.2d 780 (1995). The court dismissed the case on the statute of limitations but, nonetheless, went on to consider her specific claims. The Wisconsin Supreme Court also relied on *Pritzlaff* in dismissing another clergy sexual abuse case cited by the majority, *L.L.N. v. Clauder*, 209 Wis. 2d 674, 685, 563 N.W.2d 434 (1997), which again drew a vigorous dissent.

¶70 The lead opinion also relies on an opinion of the Missouri Supreme Court, *Gibson v. Brewer*, 952 S.W.2d 239 (Mo. 1997). There, allegedly, a priest invited a child to spend the night and sexually molested him. *Id.* at 243. The parents confronted the diocese about the priest's conduct and were told that " 'this happens to young men all the time' and that [their son] 'would get over it.' " *Id.* "After hearing of similar incidents between [the priest] and other young boys," the parents filed a nine count complaint against the pastor and the church, including claims of negligent retention and supervision. *Id.* The Missouri Supreme Court affirmed dismissal of all the claims, reasoning that merely considering the claims constituted "excessive entanglement between church and state [and] has the effect of inhibiting religion, in violation of the First Amendment." *Id.* at 246-47.

¶71 Finally, the lead opinion cites two cases out of the Southern District of New York that dismissed negligent supervision and retention-like claims, *Schmidt v. Bishop*, 779 F. Supp. 321 (S.D.N.Y. 1991) and *Ehrens v. Lutheran Church-Missouri Synod*, 269 F. Supp. 2d 328, 332 (S.D.N.Y. 2003). In *Schmidt*, a woman alleged she was sexually abused

by a priest when she was 12 years old. The lead opinion discusses language out of *Schmidt* the court used in discussing a "clergy malpractice" claim not present here.[12] Lead opinion at 672-73. The New York District Court relied upon this dicta to dismiss claims of negligent hiring, supervision, and retention in a subsequent case of alleged clergy abuse of a child in *Ehrens*, 269 F. Supp. 2d at 332.

¶72 My own research (again, unaided by the parties as this is not their theory of the case) shows that many courts (including, implicitly, this court in *C.J.C.*, 138 Wn.2d at 728) have disagreed with Wisconsin, Missouri, and the Southern District of New York courts and *have* allowed negligent supervision and retention claims to go forward. In yet another sexual misconduct case, one much closer to home, the Colorado Supreme Court concluded that "[t]he First Amendment to the United States Constitution does not grant religious organizations absolute immunity from tort liability. Liability can attach for breach of a fiduciary duty, negligent hiring and supervision." *Moses v. Diocese of Colo.*, 863 P.2d 310, 319 (Colo. 1993) (citing *Destefano v. Grabrian*, 763 P.2d 275, 284, 286-87 (Colo. 1988)). Specifically adopting the "neutral principles" approach long approved in the property conflicts arena (but rejected by the lead opinion for reasons I do not find persuasive), the Colorado court observed that "[c]ivil actions against clergy members and their superiors that involve claims of a breach of fiduciary duty, negligent hiring and supervision, and vicarious liability are actionable if they are supported by competent evidence in the record." *Id.* at 321 (citing *Destefano*, 763 P.2d at 284, 286-87).

¶73 Similarly, in another clergy sexual abuse of a child case, the Florida Supreme Court rejected the argument the

---

[12] The lead opinion does not discuss the *Schmidt* court's most memorable line: "It may be argued that it requires no excessive entanglement with religion to decide that reasonably prudent clergy of any sect do not molest children." *Schmidt*, 779 F. Supp. at 328. I completely agree and regret the federal court did not follow the wisdom of its insight.

First Amendment barred negligent hiring and supervision claims against a church. It reasoned that

> the Free Exercise Clause is not implicated in this case because the conduct sought to be regulated; that is, the Church Defendants' alleged negligence in hiring and supervision is not rooted in religious belief. Moreover, even assuming an "incidental effect of burdening a particular religious practice," the parishioners' cause of action for negligent hiring and supervision is not barred because it is based on neutral application of principles of tort law.

*Malicki v. Doe*, 814 So. 2d 347, 360-61 (Fla. 2002) (quoting *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993)). This makes good sense to me, and I believe we should follow it.

¶74 Many other courts have. I have not canvassed the country; that is for parties and law reviews. But limited research shows that the state courts of Florida, New York, Colorado, Maine, Mississippi, Minnesota, North Carolina, and Oregon have all found that judicial consideration of claims of negligent supervision and retention (or similar causes) against churches does not violate the First Amendment. *Vione v. Tewell*, 12 Misc. 3d 973, 979-80, 820 N.Y.S.2d 682 (Sup. Ct. 2006); *Fortin v. Roman Catholic Bishop of Portland*, 2005 ME 57, ¶¶ 49-54, 871 A.2d 1208; *Roman Catholic Diocese of Jackson v. Morrison*, 905 So. 2d 1213 (Miss. 2005); *Olson v. First Church of Nazarene*, 661 N.W.2d 254 (Minn. Ct. App. 2003); *Rosado v. Bridgeport Roman Catholic Diocesan Corp.*, 45 Conn. Supp. 397, 716 A.2d 967 (Super. Ct. 1998) (negligent retention not pleaded; found negligent supervision case not barred by First Amendment); *Smith v. Privette*, 128 N.C. App. 490, 495 S.E.2d 395 (1998); *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 654 N.Y.S.2d 791 (1997); *Erickson v. Christenson*, 99 Or. App. 104, 781 P.2d 383 (1989); *accord Bollard v. Cal. Province of Soc'y of Jesus*, 196 F.3d 940 (9th Cir. 1999) (First Amendment no bar to a novice priest's claim of sexual harassment during training).

¶75 The lead opinion seems to suggest that its conclusion follows from *Hosanna-Tabor.* Lead opinion at 668-70. But *Hosanna-Tabor* considered whether the ministerial exception doctrine applied to bar a petitioner's claims because *she herself* was a minister, not because, as here, someone else was. It did not purport to consider whether a *tortfeasor's* ministerial status was relevant to whether a civil claim may be pursued against a church for negligent retention and supervision.

¶76 As this court ruled not so long ago, "[t]he First Amendment does not provide churches with absolute immunity to engage in tortious conduct. So long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, it does not offend constitutional principles." *C.J.C.*, 138 Wn.2d at 728 (quoting *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 336 (5th Cir. 1998)); *accord Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990) (stating that even religiously motivated conduct is not immune from neutral laws of general applicability). Today, this court errs by retreating from this well grounded holding. While there certainly may be negligent supervision and retention claims that *would* involve interpretation of matters of faith, at least at this point, this is not one of them. We should let the parties make that argument on a case by case basis.

## B. NEUTRAL PRINCIPLES OF LAW

¶77 I also strongly disagree with the lead opinion that we should reject the "neutral principles of law" approach approved by the United States Supreme Court in *Jones v. Wolf*, 443 U.S. 595, 603, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979) and *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969) (*Mem'l Presbyterian Church*). More to the point, I think we already have. In *Church of*

*Christ at Centerville v. Carder*, 105 Wn.2d 204, 207-08, 713 P.2d 101 (1986), we approved of the "neutral principles" approach specifically in cases where no hierarchal body rendered a decision. Also, while we did not use the term "neutral principles of law" in *C.J.C.*, we held that "churches (and other religious organizations) [are] subject to the same duties of reasonable care as would be imposed on any person or entity in selecting and supervising their workers, or protecting vulnerable persons within their custody, so as to prevent reasonably foreseeable harm." *C.J.C.*, 138 Wn.2d at 722. This is substantially similar to the "neutral principles" language used in *Jones*. *See also Hoffman v. Tieton View Cmty. Methodist Episcopal Church*, 33 Wn.2d 716, 207 P.2d 699 (1949) (court will examine church governance materials to determine the nature of a property conveyance). We also firmly rejected the idea that a church was immune from tort liability under article I, section 11 of our constitution. *C.J.C.*, 138 Wn.2d at 727-28.

¶78 The lead opinion also suggests that the United States Supreme Court rejected the neutral principles approach in *Hosanna-Tabor*, 132 S. Ct. 694. Lead opinion at 676-77.[13] That is a remarkable reading of the text. *Hosanna-Tabor* never mentions "neutral principles." It does not discuss the leading neutral principles cases, *Jones*, 443 U.S. 595 and *Mem'l Presbyterian Church*, 393 U.S. 440. Nor

---

[13] The lead opinion states:

> Among other things, the [Equal Employment Opportunity Commission] and the teacher suggested that the asserted reason for firing the teacher was pretextual. The Court responded by saying that this suggestion misses the significance of the ministerial exception, which "is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that *the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone.*" *Hosanna-Tabor*, 132 S. Ct. at 709 (citation omitted).
> As this analysis instructs, there is no room for the "neutral principles of law" approach in the case of civil tort claims brought against a church involving its authority to hire and control its ministers.

Lead opinion at 676-77 (footnote omitted). In my view, the analysis instructs no such thing, and if the United States Supreme Court were to make such a breathtaking holding, I am certain it would do so explicitly.

did it have any reason to. *Hosanna-Tabor* was *not* about the approach the court should take to adjudicating disputes: *Hosanna-Tabor* was about the categorization of a particular teacher at a particular sectarian school. In the words of Chief Justice Roberts, "[t]he question presented is whether the Establishment and Free Exercise Clauses of the First Amendment bar such an action when the employer is a religious group and the employee is one of the group's *ministers.*" *Hosanna-Tabor*, 132 S. Ct. at 699 (emphasis added). Certainly, *Hosanna-Tabor* may be relevant to whether *Erdman* is a minister, a question the parties should be able to litigate on remand. But I find nothing in it that suggests the Court overruled *Jones*, 443 U.S. 595 and *Mem'l Presbyterian Church*, 393 U.S. 440.

¶79 I believe the neutral principles of law approach is the best way to protect churches from judicial interference and individuals from the categorical deprivation of their rights based on the sectarian nature of the tortfeasors.

C. ECCLESIASTICAL ABSTENTION DOCTRINE

¶80 I absolutely agree with the lead opinion that courts have no business considering questions of religious "discipline, or of faith, or ecclesiastical rule, custom, or law." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 20 L. Ed. 666 (1871). I agree that once a church member has submitted a claim to an ecclesiastical tribunal, and that tribunal has rendered a decision on religious "discipline, or of faith, or ecclesiastical rule, custom, or law," courts "must accept such decisions as final, and as binding on them, in their application to the case before them." *Id.* The trial judge concluded that is what happened here, and I find no reason to disturb her judgment.

¶81 I concur with the lead opinion that the Title VII claims should be remanded, and I agree with the Court of Appeals that Erdman's claim for negligent infliction of emotional distress against Pastor Toone, based on the record

before us, should go forward. *Erdman*, 156 Wn. App. at 843. I agree with the lead opinion that the ecclesiastical abstention doctrine bars Erdman's negligent supervision and abstention claims. But because I would not decide this case based on issues not raised by the parties, because I do not believe Pastor Toone's status as a minister is relevant to the arguments properly before us, and because I believe the neutral principles of law approach is the best way to respect both the rights of churches and individuals, I respectfully dissent in part.

STEPHENS, J., and APPELWICK, J. PRO TEM., concur with CHAMBERS, J.